IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
June 1, 2017 Session Heard at Nashville[1]

**STATE OF TENNESSEE v. SEDRICK CLAYTON**

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 1203160 Carolyn W. Blackett, Judge**

_____

**No. W2015-00158-SC-DDT-DD**

_____

A Shelby County jury convicted the defendant of the first degree murders of Arithio Fisher (Count I), Patricia Fisher (Count II), and Pashea Fisher (Count III), and the attempted first degree murder of A'reco Fisher (Count IV), as well as possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony (Count V), employing a firearm during the commission of or attempt to commit a dangerous felony (Count VI), and unauthorized use of a motor vehicle (Count VII). The jury sentenced the defendant to death for each of the first degree murders. The trial court imposed agreed-upon sentences of fifteen years for the attempted murder and three years, six years, and eleven months, twenty-nine days, respectively, for the remaining convictions, with the sentences for Counts I, II, III, IV, and VII to be served concurrently with each other and the sentences for Counts V and VI to be served concurrently with each other but consecutively to the previous sentences, for an effective sentence of death plus six years. On appeal, we hold that: (1) the evidence is sufficient to support the jury's finding that the defendant acted with premeditation in commission of the offenses; (2) the defendant waived his Fourth Amendment challenge to the trial court's denial of his motion to suppress his statements; and (3) each of the death sentences satisfies our mandatory statutory review pursuant to Tennessee Code Annotated section 39-13-206. As to the remaining issues raised by the defendant, we agree with the Court of Criminal Appeals' conclusions and attach as an appendix to this opinion the relevant portions of that court's decision. The defendant's convictions and sentences, as merged by the Court of Criminal Appeals, are affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the**
**Court of Criminal Appeals Affirmed**

---

[1] We heard oral argument in this case on June 1, 2017, at Lipscomb University in Nashville, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

ROGER A. PAGE, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., CORNELIA A. CLARK, and HOLLY KIRBY, JJ., joined. SHARON G. LEE, J., filed a separate concurring opinion.

Stephen C. Bush, Shelby County District Public Defender; Tony N. Brayton and Harry Sayle, III, Assistant District Public Defenders (on appeal); and Gerald Skahan, Kindle Nance, and Anna Benson, Assistant District Public Defenders (at trial), for the appellant, Sedrick Clayton.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Leslie E. Price, Senior Counsel; John Bledsoe, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Karen Cook, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case is before us pursuant to Tennessee Code Annotated section 39-13-206, which provides for automatic review by this Court of sentences of death.[2] The evidence adduced at trial established that the defendant fatally shot his girlfriend, Pashea Fisher; her parents, Arithio Fisher and Patricia Fisher; and attempted to kill A'Reco Fisher. He then fled the scene with his and Pashea Fisher's four-year-old daughter.

## **Factual and Procedural History**

### *Procedural History*

In his appeal as of right to the Court of Criminal Appeals, the defendant argued: (1) that the evidence was insufficient to support his convictions for first degree premeditated murder and attempted first degree murder; (2) that the trial court erred in denying his motion to suppress his statements to the police; (3) that double jeopardy principles prohibited his dual convictions for possessing a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission or attempt to commit a dangerous felony; (4) that the trial court erred in

---

[2] *See* Tenn. Code Ann. § 39-13-206(a)(1) ("Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the court of criminal appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court. Upon the affirmance by the court of criminal appeals, the clerk shall docket the case in the supreme court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure.").

admitting photographs of the victims during the penalty phase; (5) that the trial court erred in admitting recordings of two 9-1-1 calls made from the victims' residence around the time of the murders; (6) that Lieutenant Goods' guilt phase testimony on redirect examination was improper; (7) that Tennessee's death penalty scheme constitutes cruel and unusual punishment; (8) that Tennessee's death penalty scheme is unconstitutional in numerous other respects; and (9) that the defendant's sentences of death are disproportionate. *State v. Clayton*, No. W2015-00158-CCA-R3-DD, 2016 WL 7395628, at *1 (Tenn. Crim. App. Aug. 18, 2016), *appeal docketed* (Tenn. Sept. 1, 2016). The Court of Criminal Appeals affirmed the judgments of the trial court but remanded the case for entry of corrected judgments reflecting merger of the convictions for possessing a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission or attempt to commit a dangerous felony.

In the defendant's automatic appeal to this Court, he asserts that (1) the evidence was insufficient to establish that he acted with premeditation in committing the murders; (2) the trial court erred in allowing the State to introduce photographs of the three victims during the penalty phase; (3) the trial court erred by allowing Lieutenant Goods to compare the murders in this case with other murder cases he had investigated; (4) the defendant's death sentence is disproportionate based on the pool of cases utilized to conduct the proportionality review; (5) Tennessee's death penalty scheme constitutes cruel and unusual punishment; (6) the trial court erred in denying his motion to suppress his statement that was obtained during an allegedly improper detention; (7) the trial court erred in denying his motion to exclude the recordings of two 9-1-1 calls; (8) and Tennessee's death penalty scheme is unconstitutional in several respects.

In this Court's order setting forth the issues to be heard during oral argument, *see* Tenn. Sup. Ct. R. 12.2,[3] we instructed the parties to present argument with regard to four issues: (1) sufficiency of the evidence, particularly evidence of premeditation; (2) failure to suppress the defendant's statement due to a delay in taking him before a magistrate, including whether the defendant waived consideration of the issue; (3) failure to exclude recordings of the two 9-1-1 telephone calls; and (4) mandatory statutory review of the death sentence.

---

[3] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

3

*Guilt Phase*

On the morning of January 19, 2012, A'Reco Fisher[4] was asleep on the sofa in his family's living room. A'Reco lived in his parents' home, in which his sister Pashea Fisher also resided with her four-year-old daughter, J.C.[5] The defendant, who was Pashea's boyfriend and the father of her child, arrived at the residence around 12:40 a.m.; he did not reside there and did not have a key to the house, so Pashea met him at the door to let him in. The defendant walked straight back to Pashea's bedroom. In the early morning hours as A'Reco was sleeping, he was awakened by the sounds of an altercation and gunshots within the home. He heard Pashea crying, and he heard the defendant's voice. The gunshots startled A'Reco because the family did not own guns, and he did not know that the defendant had a gun. At this time of morning, it was still dark in the living room. A'Reco looked up and saw Pashea and the defendant arguing. Pashea walked down the hall toward their parents' bedroom. She entered the bedroom and shut and locked the door behind her. The defendant kicked open the door and fired his weapon. Pashea was yelling, "Stop, stop!" A'Reco then saw the defendant "handling" Pashea in the hallway. The defendant "dragged" Pashea to the front of the house, which was the living room. Pashea attempted to fight off the defendant and yelled at A'Reco to call 9-1-1. A'Reco heard the defendant tell Pashea that he was going to shoot her; he then continued to drag her and shot her in the head. The shooting occurred approximately twelve feet away from where A'Reco was positioned. The defendant then ran out of the house, taking J.C. with him. A'Reco heard a vehicle that sounded like Pashea's start up and drive away. He called 9-1-1. He checked on Pashea and determined that he could not do anything for her. A'Reco never saw his parents prior to the shooting, but he "glanced" in their bedroom afterward. Patricia was "fighting for her life," and Arithio was "already unconscious."

A Memphis Police Department ("MPD") radio dispatcher received a 9-1-1 call at 5:40 a.m. from the land line at the Fishers' residence. She described the call as an "open line call" in which the dispatcher listens to background noises or conversations but the caller never speaks. The dispatcher could hear male and female voices screaming in the background. She could also hear a small child crying. The dispatcher heard a "gurgling" sound but was unsure of the source. In the background, the dispatcher heard someone else placing a 9-1-1 call. While this open line call was ongoing, another dispatcher received the call from a male caller using a cellular telephone. The dispatcher also heard

---

[4] A'Reco Fisher, as well as the three homicide victims, share the same surname. For clarity, we will refer to the individuals by their first names. In doing so, we intend no disrespect.

[5] It is the policy of this Court to refer to minor victims or witnesses by their initials.

4

two gunshots, after which the female voice became silent. She dispatched the police, the fire department, and an ambulance to the address.

After leaving the Fishers' home, the defendant telephoned Adrienne Lewis, an occasional girlfriend and the mother of one of his children. Ms. Lewis worked the late shift that night, and she was still at work when he called. Ms. Lewis said that the defendant sounded "scared." He said he needed her to "help him think." He asked her to leave work, and then he drove toward her place of employment. The defendant left Pashea's Cadillac in a parking lot near Ms. Lewis's place of work, and he and Ms. Lewis drove away in her vehicle. J.C. was also with the defendant. They drove first to Ms. Lewis's home. As he was crying and shaking, the defendant told Ms. Lewis that he had "flipped out" and that he had shot "them." He said, "I don't know who I shot or what I shot. I just know somebody in the house . . . ." They also picked up their daughter, Y.C., because the defendant did not know when he would see his children again. Around ten minutes later, they drove to the home of the defendant's sister Tameka Rhodes. While there, a news broadcast reported the shooting and stated that two people had been pronounced dead. Soon thereafter, Jesse Clements, the defendant's brother-in-law, drove the defendant, Ms. Lewis, and the two children to the police precinct in Mr. Clements's vehicle.

MPD Sergeant Richard Borden with the Felony Response Bureau responded to the scene at Preston Street. Around 7:15 a.m., Lillian Harvey, the defendant's mother, walked up to Sergeant Borden at the scene. She had seen the news reports and thought she could help. She had spoken with the defendant and reported that he wanted to turn himself in to authorities. After several telephone calls between Sergeant Borden and the defendant, the defendant informed Sergeant Borden that he was proceeding to the Raines Station. At 8:47 a.m., Sergeant Borden received notification that the defendant was in custody and that J.C. was safe. A 0.40 Smith & Wesson pistol and two magazines were recovered from the rear passenger floorboard of the car in which the defendant arrived. The car was driven by another male and occupied by a female and two small children, both female.

MPD Officer Chase Merritt was the first officer to arrive at the crime scene. Through the glass front door he observed a "motionless" female lying in the floor. Upon entering the residence, he noticed an apparent gunshot wound to her temple. At that time, someone called out from the rear of the house, and a black male, who was later identified as A'Reco Fisher, walked down the hallway. After explaining the circumstances of shootings, A'Reco told officers that the defendant took J.C. with him but that J.C. did not want to go.

MPD Officers Matthew Biggs and Michael Tran were the next officers on the scene. When they entered, they had to step over the body of Pashea Fisher to access the

5

rest of the house. Officer Tran approached the master bedroom and noticed that the door had been kicked in and was cracked, and there were pieces of wood scattered about. They observed the body of a black male. His eyes were open, and there was a great amount of blood around his face and torso. A black female was found at the other end of the room; she was moving with difficulty and "making noises." She was unresponsive to verbal instructions. She was later transported to the hospital. In the bedroom, officers noticed bullet holes and casings, but no firearms were recovered from the residence.

MPD Lieutenant Anthony Mullins reviewed the scene and determined that the shooting began in the bedroom area and moved toward the front door. He also noted a bullet hole in the arm of the sofa through the pillow where A'Reco had been sleeping. A'Reco testified that he was startled awake by the sound of gunshots.

Emergency personnel pronounced Pashea and Arithio dead at the scene. Patricia Fisher was pronounced dead at the hospital after life-saving efforts were unsuccessful. One of the three bullet wounds she sustained entered the chest, perforated the diaphragm, the transverse colon, segments of the small bowel, and the aorta. Arithio Fisher's fatal wound was a gunshot to the neck that tore the right carotid artery and traveled through the left lung. Pashea's cause of death was a gunshot wound to the head that went through the left temporal lobe, the left petrous temporal bone at the base of the skull, and exited through the left occipital bone. When her skull was fractured, bone fragments (secondary projectiles) broke loose and caused more damage. The gunshot left stippling at the wound site, which indicated that the bullet was fired from five or six inches to three feet away. The forensic pathologist determined that the causes of death for all three homicide victims were multiple gunshots, and the manners of death were murder.

A firearms identification expert opined that all of the cartridge cases and the intact bullets that were submitted by law enforcement were fired from the firearm that was recovered at the time of the defendant's arrest. The gun was in operating condition, and the two magazines both fit the weapon and functioned in the firearm.

During the course of the investigation, Lieutenant Darren Goods interviewed the defendant. Lieutenant Goods and Sergeant Joe Stark escorted the defendant to the restroom and began the interview shortly after 4:00 p.m. on January 19, 2012. The reason for the delay was that Lieutenant Goods waited to receive additional instructions and for the Crime Scene Unit to use the alternative light source on the defendant to detect any gunshot residue. Lieutenant Goods also wanted to ensure that he was aware of all of the evidence so he could determine whether the defendant was being truthful.

Both officers entered the interview room unarmed. The defendant was shackled by his ankle to a bolted-down bench in the room. After making introductions, Lieutenant

Goods assumed the lead role and explained why they were there. He told the defendant that they were investigating the homicide of the three victims. Lieutenant Goods wrote down the defendant's biographical information and noted that "[h]e was very coherent. He understood. There [were] not any issues with him not understanding anything that we were saying." The defendant said that he completed the ninth grade at Southside High School. He denied having consumed alcohol or taken prescription drugs prior to the interview but admitted smoking marijuana at 8:00 or 9:00 p.m. the previous night. He disclaimed any mental health issues. Based on Lieutenant Goods' twenty-nine years of experience in police work, the defendant did not appear to suffer any after-effects of smoking marijuana the night before.

Before Lieutenant Goods could review the Advice of Rights form with the defendant, he began making a statement. The defendant said, "I'm sorry. I didn't mean to do it . . ." or "something along those lines." Sergeant Stark, who was taking notes, transcribed the quote as, "I'm so sorry. You ain't even got to say it." Then the defendant whispered, "I'm sorry." Lieutenant Goods asked him to pause his statement so they could review with him the Advice of Rights form. The defendant then stopped talking, and the officers and the defendant read, reviewed, and signed the Advice of Rights form. As he was writing the date the defendant said, "This is Pop's birthday." The official start time of the interview was 4:32 p.m.

Pursuant to the department policy, Lieutenant Goods began the process by taking a verbal statement from the defendant. He said that "[the defendant] began to tell his version of what happened. And his initial version of what happened wasn't exactly consistent with the evidence." The officers confronted the defendant with the initial evidence, the medical information, and the 9-1-1 recordings. Lieutenant Goods recalled that "Pashea could clearly be heard on the 9-1-1 tape of begging him not to kill her parents." The defendant commented, "She's playing a game cause they were already – that had already happened." The defendant's verbal statement lasted one hour, during which he had a break to use the restroom.

The defendant changed his statement more than once during that hour. He never asked to stop the interview and never asked for an attorney. Lieutenant Goods said that he would have stopped the interview immediately if the defendant had requested either. The defendant had already been placed under arrest and was not free to leave at that time. If he had ceased the interview, he would have gone straight to jail.

In the final version of the defendant's verbal statement, he said that he and Pashea had been dating for some time. Around 12:30 a.m., as the defendant and Pashea were engaged in sexual intercourse, the defendant noticed a strange smell as though Pashea had been having sex earlier in the day. An argument arose between them, and Pashea

7

admitted to him that she had been seeing someone else. The two of them continued to argue, then the defendant calmed down. They discussed the issue for a couple of more hours then engaged in "makeup sex." Afterward, the defendant acted as though he was going to leave her. The defendant arose to leave, and Pashea begged him to stay. The defendant tried to walk out of the room and out of the house, but he realized he left his keys and some belongings in the house. He turned around and walked toward the bedroom area but stopped at the bathroom to "wash himself off." Pashea entered the bathroom, and they argued some more. As the defendant was attempting to leave, Pashea began to tug on his shirt or jacket, which led to a "tussle in the hallway."

The defendant noticed that a light had turned on in Mr. and Mrs. Fisher's bedroom. At some point during the argument, her parents' bedroom door opened, and a "bright light" shined on him. "[A]ll of a sudden, [Arithio] knock[ed] him down, knock[ed] Pashea down." During the struggle, the defendant dropped his gun, the magazine, his keys, and his "dope" scales. He picked up the gun and started shooting. The defendant claimed that he fired because "he was in fear of his life."

Arithio and Pashea then walked into Arithio's bedroom. The defendant used his shoulder to break down the door into the bedroom and forced his way in. He began shooting into the room. He saw Patricia crawling across the bed and fired in her direction. He watched her fall in front of the mirror. The defendant initially did not think that he shot her and that she was just hiding. He turned to leave but came back and reloaded his weapon.

The defendant confirmed that he was aware that A'Reco, the Fishers' son, usually slept in the living room, either on the sofa or in the recliner. Because it was dark, the defendant shot in the general direction of where A'Reco would have been sleeping. Meanwhile, Pashea held onto the defendant, begging him not to kill her parents. The four-year-old child, J.C., began screaming. The defendant maintained that at some point, Pashea grabbed him and the gun discharged, which is when she was struck and killed. The defendant grabbed the child, left the residence, and telephoned another girlfriend to pick him up. During the call, he told the girlfriend that he had just shot the Fishers and Pashea and he was trying to get his head straight.

As the transcriptionist typed the defendant's statement during the interview, the defendant corrected her as she typed and then reviewed the final statement for corrections. The defendant made more corrections to his statement than Lieutenant Goods had ever seen anyone make. During the typewritten statement, the defendant asked, "[W]hat if I want an attorney?" Lieutenant Goods said they would stop and get him an attorney, but the defendant said he wanted to continue. Lieutenant Goods opined that the defendant had no problem understanding what was happening; he made a

8

correction on almost every page of the statement, and most of the changes were made in a way to try to mitigate his involvement. At one point, the officers tried to take a break for themselves, but the defendant said that he wanted to keep talking, so they sat back down.

With regard to A'Reco Fisher, the defendant said that if he shot toward him, it was "not on purpose, but [he] shot in the living room to scare [A'Reco] so [he] could get out." After the interview was completed, Lieutenant Goods encountered the defendant as he was awaiting the transport car to escort him to the Shelby County Jail. Lieutenant Goods described the defendant's demeanor as "cavalier." He said, "We were just kind of sitting around, talking. And he was cavalier about what had happened and I started to get a little angry with him. And he said something – 'I don't know why you're raising your voice. It's not a big deal,' or something along those lines."

Upon this evidence, the jury found the defendant guilty as charged of all counts in the indictment: Count I: first degree murder of Arithio Fisher; Count II: first degree murder of Patricia Fisher; Count III: first degree murder of Pashea Fisher; Count IV: attempted first degree murder of A'Reco Fisher; Count V: possession of a firearm with the intent to go armed during the commission or attempt to commit a dangerous felony; Count VI: employing a firearm during the commission or attempt to commit a dangerous felony; and Count VII: unauthorized use of a motor vehicle. *See* Tenn. Code Ann. §§ 39-12-101, 39-13-202(a)(1), 39-14-106, 39-17-1324(a).

*Penalty Phase*

During the penalty phase, the victims' family members testified as to the impact the victims' deaths had on them and their family, specifically A'Reco and J.C.

In mitigation, Tawana Brown, one of the defendant's sisters, offered insight into the defendant's early family life and the loss of his stepfather, with whom he was very close. She characterized the defendant as having never been a "bad person" but instead was a "joking" person who would not fight or retaliate. Ms. Brown maintained that imposition of the death penalty would be detrimental to the defendant's children. Another sister, Tameka Rhodes, spoke of the effect of the trial and possible death sentence on their mother. Adrienne Lewis testified that the death penalty would hurt her daughter, Y.C. Y.C. was, she described, a "daddy's girl," and she and the defendant co-parented their child together. A member of the defense team testified that the defendant had offered to plead to consecutive sentences of life in prison without the possibility of parole, as evidence of the defendant's acceptance of responsibility, but that the State had rejected the offer in favor of seeking the death penalty.

9

Lieutenant Mullins, testifying as an expert in blood stain pattern, opined that the entire incident began in the hallway area, close to the master bedroom. Pashea was shot in the master bedroom, as evidenced by a splinter of wood that lodged in the pants she was wearing; the only wood splinters that were found came from the master bedroom. Pashea had blood impact spatter on her feet that came from someone else; she was not standing up when the blood landed on her. The evidence led Lieutenant Mullins to conclude that the defendant and Pashea were arguing when Arithio intervened. All victims ended up in the master bedroom with the door closed when the defendant began shooting through the door. Bullets were fired through door and door frame, and powder residue was found on the door frame. In addition, he noted gunfire damage to the door latch plate.

Based on the evidence, Lieutenant Mullins concluded that Arithio was shot first. One of the shots through the door hit him as he was bent over in an attempt to hold the door closed, per the wound pattern. He was shot and then fell on the bed; the large stain of pooled blood on the bed was from Arithio. Lieutenant Mullins further deduced that Patricia was shot on the bed but that she ran around the bed and was shot again when she was on the floor by the television. Based on the pattern of bullet holes, it appeared that the defendant was "tracking" Patricia as she tried to escape. Pashea and the defendant exited the master bedroom, but Pashea was fatally shot close to the front door of the residence. Lieutenant Mullins described the defendant's shooting toward the sofa in the living room as a "deliberate shot at a very deliberate target," knowing that A'Reco usually slept on the sofa. He also observed stippling around Pashea's head wound that was visible to the naked eye, which indicated that she was shot at a distance of six inches or less.

Lieutenant Goods opined that the defendant used his shoulder to break down the bedroom door and then shot Patricia and Arithio. The defendant's shooting toward the sofa indicated an intent to shoot A'Reco.

Upon this evidence, the jury found two aggravating circumstances beyond a reasonable doubt for each of the three victims of first degree murder: (1) the defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder," and (2) the defendant committed mass murder. *See* Tenn. Code Ann. § 39-13-204(i)(3), (12). Finding that these aggravating circumstances outweighed the mitigating circumstance beyond a reasonable doubt, the jury sentenced the defendant to death for all three convictions of first degree murder. The State and trial counsel reached an agreement on the sentences for the remaining offenses, and the trial court imposed the agreed-upon sentences of fifteen years for attempted first degree murder, three years for possession of a firearm with the intent to go armed during the commission or attempt to commit a dangerous felony, six years for employing a firearm

during the commission or attempt to commit a dangerous felony, and eleven months, twenty-nine days for unauthorized use of a motor vehicle.[6]

## Analysis

### I. Sufficiency of the Evidence

The defendant does not contest the fact that he shot and killed the three victims, only that he lacked the requisite premeditation to support his three first degree murder convictions or his conviction for attempted first degree murder.

### A. Standard of Review

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citation and internal quotation marks omitted). To obtain relief on a claim of insufficient evidence, the defendant must demonstrate that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 324. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

On appellate review, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992) (citing *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978)); *see also Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). At trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This Court presumes that the trier of fact has afforded the State all reasonable inferences from the evidence and

---

[6] The trial court ordered that the sentences for Counts V and VI run concurrently with each other but consecutively to the first degree murder and attempted murder sentences.

11

resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the trier of fact, nor will we re-weigh or re-evaluate the evidence. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014) (citing *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999)); *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (citing *Bland*, 958 S.W.2d at 659); *Dorantes*, 331 S.W.3d at 379. "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Bland*, 958 S.W.2d at 659 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). Because a conviction removes the presumption of innocence that the defendant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the defendant, who must demonstrate to this Court that the evidence is insufficient to support the verdict. *Wagner*, 382 S.W.3d at 297 (citing *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011)).

## B. Premeditation

The defendant stands convicted of three counts of first degree premeditated murder and one count of attempted premeditated murder. He contends that the evidence was insufficient to support the jury's finding of premeditation. Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder as a premeditated and intentional killing of another. The defendant also stands convicted of attempted first degree murder. *See id.* § 39-12-101(a) (defining attempt as "acting with the kind of culpability otherwise required for the offense . . . [and] [acting] with intent to cause a result that is an element of the offense, and believ[ing] the conduct will cause the result without further conduct on the person's part"). Further,

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Whether a defendant acted with premeditation is a question of fact for a jury to decide and may be inferred by the jury from the context of all of the circumstances surrounding the killing. *State v. Dotson*, 450 S.W.3d 1, 86 (Tenn. 2014); *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be supported

12

by either direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors are considered to infer premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Davidson*, 121 S.W.3d at 614-15. Additional considerations include a lack of provocation on the victim's part and a defendant's failure to render aid to a victim. *Finch v. State*, 226 S.W.3d 307, 318-19 (Tenn. 2007) (citing *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992); *State v. Fugate*, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988)); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Briefly summarized, Pashea allowed the defendant to enter the Fishers' home in the middle of the night. In the early morning hours, an argument arose between Pashea and the defendant, which quickly escalated from a verbal confrontation to a physical altercation. At some point, the defendant shot Pashea in her leg. She retreated to her parents' bedroom and locked the door behind her. By force, the defendant entered the Fishers' bedroom, where he shot Arithio, killing him instantly, and Patricia, who died later at the hospital. The defendant subsequently began to retreat but instead reloaded his weapon and came back, at which time he fired into the area of the living room sofa where A'Reco was known to sleep. The defendant then dragged Pashea to the entryway of the home, where he fired a fatal shot into her head.

The evidence established that the defendant fired a deadly weapon upon four unarmed victims. The evidence lacked any indication of provocation on the part of any of the victims. Not only did he fail to render aid to any of the victims, the defendant, having already injured Pashea, fired a second and fatal bullet to kill her after reloading his weapon. The defendant's claims with regard to sufficiency of the evidence of premeditation are without merit.

## II. Motion to Suppress the Defendant's Statement

Prior to trial, the defendant filed a motion to suppress the statements that he made to the police on January 19, 2012, between 4:30 p.m. and 10:02 p.m. As grounds therefor, he asserted that officers violated his Fourth, Fifth, Sixth, and Fourteenth Amendment Rights. *See* U.S. CONST. amends. IV, V, VI, XIV. In this appeal, however, the defendant focuses his argument on his Fourth Amendment claim. The defendant states that he cited the Fourth Amendment in his motion to suppress, but he concedes that the trial court did not address this ground in its order denying the motion. Thus, the defendant failed to obtain an adverse ruling on this basis. He further acknowledges that his motion for a new trial addressed the suppression issue but omitted reference to his

Fourth Amendment argument, thus the trial court did not rule on it in the order denying the motion for a new trial.

Notwithstanding these procedural hurdles, the defendant asks us to consider his Fourth Amendment claims pursuant to our plain error review. The State responds that the defendant waived review of his Fourth Amendment claim and that the Court of Criminal Appeals correctly applied the doctrine of waiver to this claim. In its opinion, the Court of Criminal Appeals determined that "the [d]efendant included no argument or analysis on the Fourth Amendment issue in his motion to suppress . . . . After the trial court issued its order, the [d]efendant did not request the court address the Fourth Amendment issue." *Clayton*, 2016 WL 7395628, at *23. Accordingly, the court concluded that the defendant had waived his Fourth Amendment claim. *Id.* Nonetheless, the Court of Criminal Appeals conducted a plain error review, after which it found that no plain error occurred. *Id.* at **24-25.

## A. Standard of Review

We have frequently articulated the standard of review for suppression hearings. Recently we stated:

> [T]he standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this Court unless the evidence in the record preponderates against them. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence* adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.
>
> Our review of a trial court's application of law to the facts is de novo with no presumption of correctness. Further, when evaluating the correctness of the ruling by the trial court on a motion to suppress, appellate courts may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial.

*State v. Bishop*, 431 S.W.3d 22, 34-35 (Tenn. 2014) (quoting *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012))); *see also State v. Hawkins*, 519 S.W.3d 1, 32-33 (Tenn. 2017); *State v. Willis*, 496 S.W.3d 653, 686 (Tenn. 2016); *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013).

Although the defendant asserted in his motion to suppress that his statement was "inadmissible, having been obtained in violation of the Fourth, Fifth, Sixth[,] and Fourteenth Amendments of the United States Constitution and Article I Sections 8 and 9 of the Tennessee Constitution," the specific basis for his Fourth Amendment argument is that "he was held unlawfully while police elicited a statement, waiting to get the statement before taking [d]efendant to a magistrate."

We note that the Court of Criminal Appeals accurately summarized the testimony given at the hearing on the motion to suppress. *Clayton*, 2016 WL 7395628, at \*\*21-23. Thus, we will dispense with an additional summary and review the facts pertinent to this claim of error.

## B. Analysis

Sergeant Richard Borden with the MPD Felony Response Bureau testified that the defendant was placed in custody at 8:47 a.m. on January 19, 2012. Other testimony at trial explained the delay between the commission of the murders and the defendant's time of arrest. Lieutenant Darren Goods and Sergeant Joe Stark began the interview with the defendant shortly after 4:00 p.m. The defendant signed the Advice of Rights at 4:32 p.m. The typewritten statement began at 6:55 p.m. that same day.

As noted *supra*, the defendant listed in his grievances a violation of his Fourth Amendment rights in obtaining his statement based upon an alleged delay in taking him before a magistrate. Based upon the defendant's recitation of the facts, he was arrested on January 19, 2012, at 8:47 a.m. at MPD's Raines Station, and the affidavit of complaint was sworn against the defendant the following day at 11:34 a.m., nearly twenty-seven hours later. However, the defendant did not further develop this issue in his motion to suppress his statement or support it with any legal authority. Nor did he elicit testimony from Lieutenant Goods about this argument or address this argument during the hearing on the motion to suppress. The trial court did not rule on this allegation in its order denying the motion to suppress. Counsel failed to question Lieutenant Goods about the alleged delay during his trial testimony, failed to raise this ground in his motion for a new trial, and failed to argue it at the hearing on that motion. Thus, the trial court did not have the opportunity to consider this argument before denying the motion for a new trial.

This Court has held that in cases "where the record on a pretrial suppression motion . . . clearly presents an evidentiary question and where the trial judge has clearly and definitively ruled," trial counsel need not offer further objections to the trial court's ruling. *State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988). We cautioned, however, that in cases in which the "issues are only tentatively suggested or the record only

15

partially and incompletely developed[,] . . . [c]ounsel necessarily take some calculated risks in not renewing objections." *Id.*; *see State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001). In this case, we conclude that counsel's failure to obtain a ruling with regard to his Fourth Amendment argument after the suppression hearing and his failure to renew this argument during the motion for a new trial resulted in his waiving this claim of error. *See Dotson*, 450 S.W.3d at 47-48 (holding that plain error review extends to suppression issues in a capital case raised for the first time on appeal).

## C. Plain Error Analysis

Nonetheless, appellate courts in Tennessee have "the authority to 'consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) (quoting Tenn. R. App. P. 36(b)). "We refer to this discretionary consideration of waived issues as 'plain error' review." *Id.* (citing *Grindstaff v. State*, 297 S.W.3d 208, 219 n.12 (Tenn. 2009)). "Plain error" review is also available when counsel fails to lodge a contemporaneous objection when the issue first arises. *State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005). "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (alterations in original) (quoting *State v. Banks*, 271 S.W.3d 90, 127 (Tenn. 2008)).

> In Tennessee, an appellate court will grant relief for plain error only if
>
> (a)    the record clearly establishes what occurred in the trial court;
>
> (b)    a clear and unequivocal rule of law has been breached;
>
> (c)    a substantial right of the accused has been adversely affected;
>
> (d)    the accused did not waive the issue for tactical reasons; and
>
> (e)    consideration of the error is "necessary to do substantial justice."

*Id.* (citing *State v. Michael Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016); *State v. Donald Smith*, 24 S.W.3d 274, 282 (Tenn. 2000)). "'[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *Id.* (alteration in original) (internal

quotation marks omitted) (quoting *Donald Smith*, 24 S.W.3d at 283). "'If any one of these factors is not satisfied, we need not consider the remaining factors.'" *Id.* at 505 (quoting *Michael Smith*, 492 S.W.3d at 232). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Michael Smith*, 492 S.W.3d at 232); *see Willis*, 496 S.W.3d at 707 (noting that the defendant bears the burden of persuading an appellate court that plain error exists); *see also State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010); *Banks*, 271 S.W.3d at 119; *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007).

### 1. The Record is Unclear

We first note that the record is unclear about what transpired in the trial court with regard to the facts underlying the defendant's motion to suppress. The facts upon which the defendant relies include a statement in his motion that the affidavit of complaint was not sworn until nearly twenty-seven hours after his warrantless arrest. Given that the defendant has failed to include the affidavit in the appellate record, the record does not support this statement. "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). We will not presume error from a silent record. On this basis, the prerequisites for plain error cannot be met.

### 2. Clear and Unequivocal Law Was Not Breached

The defendant asserts that a clear and unequivocal law has been breached by the alleged delay in taking him before a magistrate, based on the rules set forth by *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

We begin our analysis with the observation that the defendant was clearly arrested without a warrant when he turned himself in at the Raines Station at 8:47 a.m. on January 19, 2012. When a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to "'seek a prompt judicial determination of probable cause.'" *Bishop*, 431 S.W.3d at 42 (quoting *Gerstein*, 420 U.S. at 125); *State v. Huddleston*, 924 S.W.2d 666, 668 (Tenn. 1996). "[A] delay of less than forty-eight hours is presumptively reasonable . . . ." *Bishop*, 431 S.W.3d at 42 (citing *McLaughlin*, 500 U.S. at 56-57). Even so, if the delay is "for the purpose of gathering additional evidence to justify the arrest," is "motivated by ill will against the arrested individual," or is "delay for delay's sake," a delay shorter than forty-eight hours may still be considered unreasonable and therefore unconstitutional. *Id.* (quoting *McLaughlin*, 500 U.S. at 56).

As a remedy for a *Gerstein* violation, this Court in *Huddleston* concluded that "the exclusionary rule should apply when a police officer fails to bring an arrestee before a magistrate within the [48 hours] allowed by *McLaughlin*." *Id.* (alteration in original) (quoting *Huddleston*, 924 S.W.2d at 673). Applying the "fruit of the poisonous tree" doctrine, this Court held that any evidence obtained as a result of an arrestee's unlawful detention must be excluded from evidence unless the arrestee's statement was "'sufficiently an act of free will to purge the primary taint' of the illegal detention." *Id.* (quoting *Huddleston*, 924 S.W.2d at 674-75). However, we also explained that "when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Id.* (quoting *Huddleston*, 924 S.W.2d at 675) ("Initially, detention is not illegal, but later ripens into a constitutional violation."). "'Obviously,' we noted, 'if the [arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Id.* (quoting *Huddleston*, 924 S.W.2d at 675).

"Probable cause exists when 'at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" *Id.* at 36 (quoting *Echols*, 382 S.W.3d at 277-78. Whether the police possessed probable cause requires consideration of "the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information," such as when officers are relaying information or when one officer directs other officers to act. *Id.* at 36 (citing *Echols*, 382 S.W.3d at 278).

Based on the testimony at both the suppression hearing and at trial, law enforcement officers in this case had an eye-witness to the murders and were privy to the recordings of the 9-1-1 calls. At the time of the defendant's arrest, the police had probable cause to believe that a felony had been committed and that the defendant was the person who committed it.

The defendant's warrantless arrest was attended by probable cause at the time the arrest was made. Even taking the defendant's recitation of the facts as true and reviewing the facts established by the record, the defendant was placed under arrest at 8:47 a.m., and his interview with police began around 4:00 p.m. Thus, his interview began shortly after he had been in custody for seven hours. He was taken before a magistrate around twenty-seven hours after being arrested. Any delay that would have occurred would not have ripened to a *Gerstein* violation until the duration exceeded forty-eight hours because it was supported by probable cause. The duration itself was, at best, twenty-seven hours.

18

The defendant failed to demonstrate that the delay was caused by an improper purpose. He has failed to carry his burden of persuasion that a clear and unequivocal law was breached. He is not entitled to plain error relief on this issue.

## *III. Mandatory Review of Death Sentence*

This Court is statutorily required to review the defendant's death sentence. Tenn. Code Ann. § 39-13-206(a)(1). Our review includes analyzing whether (1) the death sentence was imposed in any arbitrary fashion; (2) the evidence supports the jury's findings of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and (4) the capital sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. *Id.* § 39-13-206(c)(1)(A)-(D).

## A. Imposition of Death Penalty

Pursuant to the trial court's instructions at the penalty phase of the trial, the jury unanimously determined that the State had proven beyond a reasonable doubt the aggravating circumstances as applied to each of the defendant's convictions for first degree murder and, further, that these aggravating circumstances outweighed the mitigating circumstances. Our review of the record reveals that the trial court conducted the penalty phase of the trial in compliance with the applicable statutory provisions and the Tennessee Rules of Criminal Procedure. As such, we conclude that the defendant's sentences of death were not imposed in an arbitrary fashion.

## B. Sufficiency of the Evidence
## Establishing Aggravating Circumstances

"In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, the relevant inquiry is whether a rational trier of fact, taking the evidence in the light most favorable to the prosecution, could have found the existence of the aggravating circumstances beyond a reasonable doubt." *Dotson*, 450 S.W.3d at 78 (citing *State v. Jordan*, 325 S.W.3d 1, 66-67 (Tenn. 2010); *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006)). When imposing the death sentence for the defendant's convictions of first degree murder of each of the three victims, the jury applied two aggravating circumstances. We consider each one in turn.

## 1. Aggravating Circumstance #1

The jury found that "[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." Tenn. Code Ann. § 39-13-204(i)(3). The defendant does not challenge the sufficiency of the evidence supporting this aggravating factor.

We must nevertheless conduct an independent review of the jury's finding in this regard. The evidence viewed in the light most favorable to the State established that in addition to fatally shooting Arithio, Patricia, and Pashea Fisher, the defendant fired his weapon toward the area in which he knew A'Reco Fisher often slept. This, coupled with the presence of four-year-old J.C. during the indiscriminate shooting, supports the finding of this circumstance.

## 2. Aggravating Circumstance #2

The jury also found that, as applied to this case, "[t]he defendant committed 'mass murder,' which is defined as the murder of three (3) or more persons . . . during a single criminal episode . . . ." Tenn. Code Ann. § 39-13-204(i)(12). Again, despite the defendant's acquiescence in the jury's finding, we nonetheless consider the evidence supporting this aggravating circumstance and deem it sufficient in support thereof. The undisputed evidence, thoroughly set forth *supra*, is that the defendant fatally shot all three victims during the same criminal episode. The evidence clearly supports the jury's finding in this regard.

### C. Aggravating Circumstances Outweigh
### Mitigating Circumstances

During the penalty phase, the jury determines whether mitigation exists and whether the aggravating circumstances outweigh the mitigation evidence beyond a reasonable doubt. *Bland*, 958 S.W.2d at 661 (citing *State v. Barber*, 753 S.W.2d 659, 669 (Tenn. 1988)). On appeal, we are statutorily required to assess whether "[t]he evidence supports the jury's finding that the aggravating . . . circumstances outweigh any mitigating circumstances." Tenn. Code Ann. § 39-13-206(c)(1)(C); *State v. Freeland*, 451 S.W.3d 791, 820 (Tenn. 2014) (explaining that our task is to determine "whether a rational trier of fact could find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt when the evidence is taken in the light most favorable to the State").

In this case, the trial court instructed the jury with regard to the following mitigating circumstances: (1) the defendant's lack of a significant history of prior criminal activity; (2) evidence suggesting that the murder was "out of character" for the

defendant; (3) evidence of "provocation or self-protection"; (4) the relationship between the victims and the defendant; (5) the defendant's cooperation with authorities and his actions in surrendering to the police; (6) the defendant's role as a "loving son and a loving family member"; (7) the defendant's role as a "loving father" who provides "love and support to his children"; (8) the loss of the defendant's stepfather, who was a "father figure" in the defendant's life; (9) the impact of the defendant's death on his family; (10) any statements of remorse by the defendant; and (11) any other mitigating factor raised by the evidence.

As noted *supra*, the undisputed evidence supports the jury's finding of the two aggravating circumstances. Taking the evidence in the light most favorable to the State, a rational trier of fact could have concluded that the overwhelming evidence underlying the aggravating circumstances outweighed the mitigation evidence beyond a reasonable doubt.

## D. Proportionality Review

### 1. Standard of Review

Finally, we are statutorily required to review the defendant's sentence of death to determine whether it is excessive or disproportionate to the penalty imposed in similar cases. Our review is intended to determine whether the defendant's death sentence is aberrant, arbitrary, or capricious insofar as it is "disproportionate to the punishment imposed on others convicted of the same crime." *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 43 (1984)). Our review employs the precedent-seeking method of comparative proportionality review, in which we compare the case *sub judice* with other cases involving similar crimes and similar defendants. The pool of cases relevant to our consideration consists of "those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006) (citing *State v. Godsey*, 60 S.W.3d 759, 783 (Tenn. 2001); *Bland*, 958 S.W.2d at 666).

While no crimes or defendants are identical, a death sentence is disproportionate if the case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Bland*, 958 S.W.2d at 668. Thus, in our proportionality review, we examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002). More specifically, we consider

21

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Reid*, 164 S.W.3d, 286, 316 (Tenn. 2005) (citing *Bland*, 958 S.W.2d at 667). We also consider several factors about the defendant, including his (1) record of prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical conditions; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id*. at 316-17.

## 2.  Application to This Case

In this case, addressing the proportionality analysis required by Tennessee Code Annotated section 39-13-206(c)(1)(D), the defendant asserts that this Court should expand the parameters of this review and consider a broader pool of cases in our comparison.

We have previously addressed and rejected this issue. *State v. Pruitt*, 415 S.W.3d180, 217 (Tenn. 2013); *Godsey*, 60 S.W.3d at 784; *Bland*, 958 S.W.2d at 662. In *Bland*, we noted that the legislature did not define what should constitute "similar cases" to be used in our proportionality review, and we examined the approaches utilized by other states. *Pruitt*, 415 S.W.3d at 214 (citing *Bland*, 958 S.W.2d at 65-66). We discussed three primary categories used by other jurisdictions:  those in which the death penalty has been imposed; those in which the State sought the death penalty and the court held a sentencing hearing, regardless of the sentence imposed; and those including all death-eligible convictions, regardless of whether the death penalty was sought. *Id.* (citations omitted).  This Court rejected the first and last approaches in favor of a comparison of the pool of cases that included "first degree murder cases in which a capital sentencing hearing was conducted to determine whether the sentence should be death, life imprisonment without the possibility of parole, or life imprisonment, regardless of the sentence returned by the jury," thus aligning Tennessee with several other states. *Id.* at 214-15 (citations omitted).

We revisited this issue again in *Godsey* and expanded the rationale behind the *Bland* decision. *Id.* at 215 (citing *Godsey*, 60 S.W.3d at 783-84). In that case, we again assessed the three primary pools of cases considered by other states in conducting a proportionality review and reaffirmed our use of the pool defined by *Bland.* In *Pruitt*, we rejected the argument that "the pool should include all cases in which the death penalty

could have been sought, thereby permitting the Court to oversee prosecutorial charging decisions [or that] [a]lternatively, . . . the pool include all cases in which first degree murder is charged." *Id.* at 215-16. We emphasized:

> We continue to find it difficult to make a meaningful comparison between a death penalty case on appeal and other cases in which the death penalty was never sought. As discussed in *Bland* and *Godsey*, prosecutorial discretion creates the dividing line between the pool of cases adopted in *Bland* and the other suggested pools. In advocating for one of the two alternative pools, [the defendant] and the dissent find it appropriate for the Court to oversee prosecutorial decisions to charge defendants with death-eligible crimes. We have historically rejected such an approach as an inappropriate invasion into the independent prosecutorial function.

*Id.* at 216. We decline to deviate from our well-settled precedent that the appropriate pool of cases to be considered in our proportionality review includes only those cases in which the State sought the death penalty, the court held a sentencing hearing, and the jury returned a verdict, regardless of the outcome.

We next turn to our statutory proportionality comparison of the defendant's case. "Our analysis is intended to determine whether the defendant's sentence of death 'is disproportionate to the sentences imposed for similar crimes and similar defendants.'" *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting *Bland*, 958 S.W.2d at 664).

> In undertaking this analysis, we apply the precedent-seeking method of comparative proportionality review, in which we compare the present case with other cases involving similar defendants and similar crimes. We examine the facts and circumstances of the crime, the defendant's characteristics, and the aggravating and mitigating factors involved. Because no two defendants or crimes are identical, we cannot limit our comparison to those cases where a defendant's death sentence is "perfectly symmetrical." Rather, we seek only to "identify and invalidate the aberrant death sentence." A sentence of death is disproportionate when "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed."

*Id.* at 232-33 (internal citations omitted).

Based on our thorough review of the record and Supreme Court Rule 12 reports,[7] we conclude that the death sentence imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. The Court of Criminal Appeals noted several cases in which this Court upheld death sentences based on the commission of mass murder. *See, e.g., Dotson*, 450 S.W.3d 1 (defendant shot and killed four adults and stabbed and beat his two nephews, killing them; aggravating circumstances included mass murder and great risk of death of two or more persons); *Jordan*, 325 S.W. 3d 1 (defendant shot to death his estranged wife and two men at wife's place of employment; aggravating circumstances included mass murder, felony murder, and great risk of death of two or more persons, plus heinous, atrocious, or cruel and mutilation of a body as to the wife); *State v. Holton*, 126 S.W.3d 845 (Tenn. 2004) (defendant shot and killed his four children; aggravating circumstances included mass murder and killing of a person under twelve years of age as to three of the four victims); *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000) (defendant shot two men, strangled one female, and buried them all alive; aggravating circumstances included mass murder, felony murder, heinous, atrocious, or cruel, and prior violent felony conviction); *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993) (defendant shot and stabbed his wife and two stepsons; aggravating circumstances included mass murder, felony murder, heinous, atrocious, or cruel, and murder to avoid apprehension).

The court also identified many cases in which the defendant murdered his wife or girlfriend. *See, e.g.*, *State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006) (defendant shot estranged girlfriend multiple times; aggravating circumstances included prior violent felony conviction and murder to avoid apprehension); *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005) (defendant killed wife by striking her in the head repeatedly with an iron skillet; aggravating circumstance included prior violent felony conviction); *State v. Suttles*, 30 S.W.3d 252 (Tenn. 2000) (defendant stabbed girlfriend to death; aggravating circumstances included heinous, atrocious, or cruel and prior violent felony conviction); *State v. Keough*, 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after arguing in a bar, left her in a car to bleed to death; aggravating circumstance included prior violent felony conviction); *State v. Hall*, 8 S.W.3d 593 (Tenn. 1999) (following an argument, the defendant beat, strangled, and drowned his wife; heinous, atrocious, or cruel aggravator); *State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife with a plastic bag; aggravating circumstances included heinous, atrocious, or cruel and prior violent felony conviction).

---

[7] Pursuant to Tennessee Supreme Court Rule 12, trial courts must file an extensive report in every case in which a defendant is convicted of first degree murder. These reports include data about the crime, the defendant, and the punishment imposed. *See* Tenn. Sup. Ct. R. 12(1) and the appendix thereto.

Four capital cases involved both mass murder and domestic violence. *See, e.g., Dotson*, 450 S.W.3d 1; *Jordan*, 325 S.W.3d 1; *Holton*, 126 S.W.3d 845; *Smith*, 868 S.W.2d 561.

However, our review must involve consideration of not only the circumstances of the crimes but of pertinent factors about the defendant himself, including his (1) record of prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical conditions; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Bland*, 958 S.W.2d at 667. Similar to this defendant, this Court has previously upheld death sentences that have been imposed despite a defendant's lack of prior criminal history. *See, e.g., Terry v. State*, 46 S.W.3d 147, 150-52 (Tenn. 2001) (minister who had no prior criminal record concocted a scheme to disappear and change his identity; shot and killed church handyman); *State v. Keen*, 31 S.W.3d 196, 220 (Tenn. 2000) (defendant forcibly raped victim and killed her by strangulation; no prior criminal record); *Bland*, 958 S.W.2d at 661 (no adult prior criminal history but substantial juvenile record). We have rejected pleas for relief based on alleged cooperation with law enforcement where, as in this case, a defendant cooperated with law enforcement but only after the urging of family members and after a full-scale search for him had begun. *See Bland*, 958 S.W.2d at 661.

"[O]ur task does not require a finding that this case is exactly like a prior case in every respect, nor does it require a determination that this case is 'more or less' like other similar death penalty cases." *State v. Davis*, 141 S.W.3d 600, 622 (Tenn. 2004). Based upon our close review of the entire record in this case, combined with our review of these and other cases in which the death penalty was imposed and upheld, we hold that the sentence of death imposed in this case is not disproportionate to the penalty imposed for similar crimes under similar circumstances. The defendant is not entitled to relief on this basis.

## Conclusion

In accordance with Tennessee Code Annotated section 39-13-206 *et. seq.* and the principles adopted in prior decisions, we have considered the entire record and conclude that the evidence supports the jury's finding of the statutory aggravating circumstances; that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances; and that the sentence is not arbitrary, excessive, or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the

25

decision of the Court of Criminal Appeals. The relevant portions of that opinion are attached as an appendix to this opinion. The defendant's sentence of death is affirmed and shall be carried out on the 28th day of November, 2018, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

_____
ROGER A. PAGE, JUSTICE

## APPENDIX
### (Excerpts from the Decision of the Court of Criminal Appeals)

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
### March 1, 2016 Session

## STATE OF TENNESSEE v. SEDRICK CLAYTON

**Appeal from the Criminal Court for Shelby County**
**No. 1203160        Carolyn W. Blackett, Judge**

_____

### No. W2015-00158-CCA-R3-DD

_____

### [INTRODUCTION]

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, J., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton and Harry Sayle III, Assistant Public Defenders (on appeal); and Gerald Skahan, Kindle Nance, and Anna Benson, Assistant Public Defenders (at trial), for the Appellant, Sedrick Clayton.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; John Bledsoe, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Karen Cook, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### [GUILT PHASE]

### [PENALTY PHASE]

### ANALYSIS

### [I. SUFFICIENCY OF THE EVIDENCE]

27

**III. Double Jeopardy**

The Defendant contends that his dual convictions for possession of a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission or attempt to commit a dangerous felony violate double jeopardy principles. The State concedes the convictions should merge, and we agree.

Our supreme court announced our current double jeopardy analysis in *State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). In *Watkins*, the court abandoned the analysis provided previously in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), and adopted the "same elements" analysis delineated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Therefore, whether dual convictions violate double jeopardy principles requires a determination of "whether the convictions arise from the same act or transaction." *Watkins*, 32 S.W.3d at 557. If the convictions arise from the same act or transaction, the second inquiry is whether the elements of the offenses are the same or whether one offense is a lesser included offense of the other. *Id.* If the elements are the same or one offense is a lesser included offense of the other, dual convictions violate double jeopardy principles. *Id.* Appellate courts "will presume that multiple convictions are not intended by the General Assembly" when the elements of the offenses are the same or when one offense is a lesser included offense of the other. *Id.*

The jury found that the dangerous felony for both firearm convictions was attempted first degree murder. Based upon the evidence presented at trial, we conclude that the firearm convictions arose from the same act or transaction. Furthermore, possession of a firearm with the intent to go armed during the commission of a dangerous felony is a lesser included offense of employing a firearm during the commission of a dangerous felony. *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). Accordingly, we conclude that the Defendant's dual firearm convictions violate the principles of double jeopardy. We remand the case to the trial court for entry of corrected judgment forms reflecting merger of the possession of a firearm with the intent to go armed during the commission of a dangerous felony conviction with the employing a firearm during the commission or attempt to commit a dangerous felony conviction. *See State v. Davis*, 466 S.W.3d 49, 77-78 (Tenn. 2015) (providing that when dual convictions violate the principles of double jeopardy, the lesser offense should be merged into the greater offense).

**IV. Admission of Photographs During the Penalty Phase**

The Defendant contends that the trial court erred in admitting three photographs depicting the face of each victim during the penalty phase of the trial. The State contends

that the trial court did not abuse its discretion in admitting the photographs. We agree with the State.

During a jury-out hearing, the prosecutor stated that she was seeking to introduce the three photographs in support of the mass murder aggravating circumstance. One photograph was taken at the crime scene and depicted the side of Pashea's head and her shoulder. The second photograph also was taken at the crime scene and depicted Arithio's face after officers rolled over his body. The third photograph depicted Patricia's face and was taken at the Med. Trial counsel objected and argued that the photographs were unnecessary because the jury had convicted the Defendant of killing three people. Counsel asserted that the mass murder aggravator had been established by the jury's verdict and agreed to stipulate to the mass murder aggravator. The prosecutor declined to stipulate and argued that the State was required to prove its case and that the photographs would provide a greater impact than a stipulation.

The trial court found that while the photographs were "extremely, highly prejudicial," they were admissible during the penalty phase. The court noted that the State was required to establish the aggravating circumstances. The court expressed concern regarding the reaction of the victims' family upon viewing the photographs during the penalty phase and any impact that such a reaction might have on the jury. The prosecutor assured the court no outbursts would occur. During the penalty phase, Lieutenant Mullins testified regarding the aggravating circumstances, and the three photographs were introduced to support his testimony. The record does not reflect any outbursts from the trial spectators.

The Defendant maintains that the trial court abused its discretion in admitting the photographs because the photographs were cumulative to evidence presented at the guilt phase and because defense counsel had offered to stipulate to the mass murder aggravator. In *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978), our supreme court provided trial courts with guidance for determining the admissibility of relevant photograph evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Banks*, 564 S.W.2d at 951. The supreme court noted the State's burden in establishing that the probative value of particularly gruesome photographs outweighs any prejudicial effect is often difficult to meet "[i]n the presence of an offer to stipulate the facts shown in the photograph." *Id*. This standard, however, "applies only during the guilt phase of the trial under the more rigid guidelines established by our Rules of Evidence." *State v. Odom*, 336 S.W.3d 541, 566 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949-51). Although the Tennessee Rules of Evidence govern the admissibility of photographs at the trial, the admission of photographs during the penalty phase of a capital case is governed

by Tennessee Code Annotated section 39-13-204(c). *See id.* at 564. The statute provides for the admission of evidence on "any matter that the court deems relevant to the punishment," including "any evidence tending to establish or rebut the aggravating circumstances . . . regardless of its admissibility under the rules of evidence." T.C.A. 39-13-204(c); *see also State v. Carter*, 114 S.W.3d 895, 903 (Tenn. 2003) (providing that under this statute, "any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment").

A trial court may use the Tennessee Rules of Evidence as guidance during the penalty phase of a capital murder trial. *Carter*, 114 S.W.3d at 903. However, the Rules of Evidence "should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." *State v. Sims*, 45 S.W.3d 1, 14 (Tenn. 2001). Rather, the trial court must examine the "reliability, relevance, value, and prejudicial effect" of the evidence. *Id*. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *Odom*, 336 S.W.3d at 565.

We conclude that the trial court did not abuse its discretion in allowing the State to introduce the photographs. The photographs were relevant to establishing the mass murder aggravating circumstance. *See* T.C.A. § 39-13-204(i)(12). The photographs were not unduly gruesome or unfairly prejudicial in light of the other evidence presented at the trial, and the number of photographs was limited to one for each victim. The Defendant is not entitled to relief with regard to this issue.

## V. Admission of the Recordings of the 9-1-1 Calls

The Defendant maintains that the trial court erred in denying his motion to exclude the audio recordings of the two 9-1-1 calls. He asserts that the recordings were irrelevant and unfairly prejudicial. The State responds that the trial court did not abuse its discretion in permitting the State to play the recordings to the jury. We agree with the State.

Prior to the trial, the Defendant filed a motion to exclude the recordings and the transcripts of the two 9-1-1 calls. He argued that the recordings were highly prejudicial. Trial counsel stated that they were willing to stipulate to the identities of the three murder victims and that their bodies were found after 9-1-1 dispatch sent ambulances to the victims' home. The Defendant argued that as a result, the recordings had little probative value and that playing the recordings would only elicit an emotional response from the

jury. He also requested that the transcripts of the calls be excluded as inherently unreliable and inadmissible hearsay.

Following a hearing, the trial court entered an order on April 7, 2014, denying the Defendant's motion to exclude the recordings. The trial court found that both calls were relevant to establishing identity, state of mind, and premeditation.

With regard to the recording of the 9-1-1 call made by A'Reco, the trial court found as follows:

> The caller clearly relays to the 911 operator the events that have occurred. It is not difficult to hear the caller or the operator and both the caller and operator can be easily understood. The call is relevant as it provides a snapshot of the events surrounding the murders as they occurred in real time. The caller identifies the perpetrator and provides details surrounding the timeline of the murder and the state of mind and intent of the defendant. While there appears to be a victim moaning in the background, this court does not find the tape is inflammatory or overly prejudicial when weighed against its probative value.

During a hearing prior to entering the order, the trial court also stated that "the call primarily consists of the caller relatively calmly informing the officers of the events that have transpired" and that as a result, the recording of the call is not "overly inflammatory."

During a hearing prior to entering the order, the trial court also described the "open line" call as "incredibly difficult to listen to. There is screaming. One of the victims is moaning and the victim [is] pleading for her life, her parent's lives and the child's life." In its written order, the trial court found as follows:

> The call is chaotic and contains multiple voices. There is screaming from [the] victim, [Pashea] Fisher, the victim's small child[,] and the defendant. In addition, at one point during the call, the subsequent call from [A'Reco] may be heard in the background and a victim can be heard moaning. However, despite the fact that it is difficult to discern all of the statements being made by the various individuals who can be heard on the call, this court finds the call is highly relevant to the issue of identity and premeditation. The call gives a real time snapshot of what occurred inside the house at the time of the shooting. Additionally, the call contains the statements of the defendant which may rebut the statement given by defendant to police. Moreover, the tape is necessary to aid the state in

31

establishing a timeline of the events as they unfolded. For these reasons, the court finds the probative value of the 911 call is great when compared to the potential prejudice to the defendant; thus, the tape may be admitted at trial.

The trial court found that the statements made during the calls qualified under the excited utterance exception to the hearsay rule. *See* Tenn. R. Evid. 803(2). The trial court also allowed the State to introduce a redacted version of the transcript of the 9-1-1 call made by A'Reco but precluded the State from introducing a transcript of the "open line" call.[8] The trial court ordered collection of the copies of the transcript after the recording was played and said a special instruction would be given to the jury.

Evidence is relevant if it has "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence generally is admissible. Tenn. R. Evid. 402. Relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993).

We conclude that the trial court did not abuse its discretion in permitting the State to introduce the recordings of the 9-1-1 calls. The Defendant argues that the trial court erred in finding that the recordings were relevant to the issue of identity because identity was not a disputed issue at the trial. The State, however, has the burden of establishing every element of the charged offenses beyond a reasonable doubt, including the identity of the Defendant as the perpetrator regardless of whether a defendant disputes those issues at trial. Furthermore, the trial court correctly found that the recordings were relevant to the issues of intent and premeditation, both of which were issues at the trial. The recordings provided details surrounding the timeline of the shootings and were used to rebut portions of the Defendant's statements to the police.

---

[8] The Defendant does not challenge the trial court's ruling that the statements in the calls qualified under the excited utterance exception to the hearsay rule or the court's determinations regarding the transcripts. The transcript of the 9-1-1 call made by A'Reco was not entered into evidence and was not included in the appellate record.

Relative to prejudice, the recording of the call made by A'Reco consists of A'Reco calmly informing the officers of the shooting. The trial court properly found that the record was not "overly inflammatory." The "open line" call was more chaotic. The recording reflected that J.C. was screaming, that Pashea and the Defendant were yelling, that Pashea was begging the Defendant not to kill her parents, and that two shots were fired, after which Pashea was no longer heard in the recording. However, in light of the fact that the issues of premeditation and intent were highly contested at trial, we conclude that the probative value of the two recordings was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this issue.

## VI. Admission of Lieutenant Goods' Testimony

The Defendant asserts that the trial court erred in permitting Lieutenant Goods, on redirect examination, to compare the victims' homicides with other killings he had investigated and to testify regarding the impact the homicides in the present case had on him. The Defendant also asserts that the court erred in permitting Lieutenant Goods to compare the Defendant's attitude with the attitudes of other suspects Lieutenant Goods previously interviewed.

On direct examination, Lieutenant Goods testified that after he played the open line 9-1-1 recording for the Defendant, the Defendant stated that Pashea was "playing a game" when she begged him not to kill her parents because he already had shot them. The prosecutor asked Lieutenant Goods how he responded, and he stated that he became angry and said "[s]omething to the effect of [you're] either full of s--- or you've lost your f------ mind." The prosecutor asked how the Defendant responded, and Lieutenant Goods initially said that the Defendant stated that "it was no big deal." Upon further questioning by the prosecutor, Lieutenant Goods corrected his testimony and stated the Defendant's statement that "it was not a big deal" occurred after the written statement was complete. Lieutenant Goods clarified that the Defendant did not respond when Lieutenant Goods became angry.

Lieutenant Goods later testified on direct examination that as they were waiting on a car to transport the Defendant to jail for processing, the Defendant "was cavalier about what had happened." Lieutenant Goods said that he became angry and that the Defendant made a statement to the effect that "I don't know why you're raising your voice. It's not a big deal." Lieutenant Goods said he told the Defendant that "he must be out of his f------ mind."

On cross-examination, trial counsel questioned Lieutenant Goods regarding the importance of preserving evidence and taking notes because "memories fade over time." Lieutenant Goods testified that although he did not take notes during the interview,

Sergeant Stark took notes.  In response to questioning by counsel, Lieutenant Goods said his testimony was based upon his memory and his review of Sergeant Stark's report. Counsel repeatedly questioned Lieutenant Goods about his not taking notes and not recording the Defendant's interview.

Lieutenant Goods also testified on cross-examination that the policy of the Memphis Police Department was not to record an interview with a suspect.  Trial counsel asked Lieutenant Goods whether it was the policy of the Memphis Police Department to tell someone that they are "f------ crazy."  Lieutenant Goods acknowledged that he made the statement to the Defendant twice and that the statement was his reaction to interacting with the Defendant.  Counsel further questioned Lieutenant Goods regarding whether such a statement could be perceived as "mean" and could frighten someone.

On redirect examination, the prosecutor questioned Lieutenant Goods regarding the policy of the Memphis Police Department against recording suspect interviews, and Lieutenant Goods acknowledged that he would have recorded the interview had he been required to do so.  The prosecutor then questioned Lieutenant Goods as follows:

All right.  You were asked some questions about calling the defendant or asking the defendant if he was f------ crazy.  I want to follow up on that one.  How many homicides do you think you've participated in?

Trial counsel objected on the basis of relevance, and the trial court allowed the prosecutor to continue after the prosecutor assured the court that she would "make it relevant." Lieutenant Goods testified that he had investigated about 200 homicides and that he specifically recalled this investigation.  The prosecutor asked him, "Did it get to you?," and he responded, "Yes."

Trial counsel objected on the basis of relevance.  The prosecutor responded that counsel opened the door to the testimony by questioning Lieutenant Goods about whether his use of particular language was consistent with police policy.  The trial court allowed the prosecutor to question Lieutenant Goods regarding whether his reaction to the Defendant was a normal reaction based upon the number of cases that he had investigated, but the court instructed the prosecutor to rephrase the question.  The prosecutor questioned Lieutenant Goods as follows:

Q. You said you remember this one. Why do you remember this one?

A. Because of the 911 tape, because of [J.C.] and listening to that tape and the first thing that I hear was her screaming, and the fact that we don't get many triple homicides in this city at one time and this was a triple homicide.

Q. Do you call every person that is interviewed by yourself or ask every person that you interview are they f------ crazy?

A. No, ma'am.

Q. And what was the reason for asking [the Defendant] was he f------ crazy?

A. He had a very cavalier, nonchalant attitude about the entire thing. And he made a statement I don't know why you're upset, it's no big deal or something along those lines, and so that was my response to that statement.

"The admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court, whose ruling will not be reversed absent an abuse of that discretion." *State v. Chearis*, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (citing *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994)). The trial court "'has discretion to permit the witness on redirect to testify about new facts that were not mentioned on direct or cross-examination.'" *State v. Danny Owens*, No. M2012-02717-CCA-R3-CD, 2014 WL 1173371, at *19 (Tenn. Crim. App. Mar. 24, 2014), (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.11[6][b] (4th ed. 2000)), *perm. app. denied* (Tenn. Sept. 25, 2014).

Contrary to the Defendant's argument on appeal, the record reflects the trial court did not allow the prosecutor to elicit testimony from Lieutenant Goods comparing the victims' homicides to other homicides he had investigated. Rather, after trial counsel objected to the prosecutor's question about whether the homicides in this case affected Lieutenant Goods, the court instructed the prosecutor to rephrase the question. The prosecutor abandoned the line of questioning and asked Lieutenant Goods why he recalled the homicides.

Lieutenant Goods's testimony that he specifically recalled these homicides because of the 9-1-1 calls and because the investigation was a triple homicide rebutted defense counsel's challenge on cross-examination to Lieutenant Goods's memory of the events. Evidence that is not admissible based on relevance may be admitted if the defendant "opens the door" by putting the issue into controversy. The doctrine of "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). A party who raises an issue at trial "'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (internal citations omitted). We conclude that counsel opened the door to

the testimony during cross-examination and that, as a result, Lieutenant Goods's testimony regarding why he recalled the homicide was properly admitted.

Regarding Lieutenant Goods's testimony on redirect examination explaining why he had cursed at the Defendant, we note that Lieutenant Goods provided the same testimony on direct examination relative to the Defendant's "cavalier, nonchalant attitude" without any objection by the Defendant. Therefore, this issue is waived. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection . . . appears of record, stating the specific ground of objection if the specific ground is not apparent from the context[.]"); *see also* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Furthermore, we conclude that even if the admission of Lieutenant Goods's testimony on redirect examination was error, the Defendant failed to demonstrate that the trial court's error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *see also State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008) (applying Tennessee Rule of Appellate Procedure 36(b) harmless error review to trial court's erroneous admission of evidence).

### [VII. CRUEL AND UNUSUAL PUNISHMENT]

### [VIII. CONSTITUTIONALITY OF THE DEATH PENALTY]

### [IX. MANDATORY REVIEW]

### X. Judgments for Non-Capital Offenses

During the sentencing hearing on the non-capital convictions, the parties announced that they reached an agreement. The prosecutor described the agreement as follows:

> Your Honor, in 12-02160, count four, criminal attempted murder first, the State is recommending and agreeing with the Defense as to that, as a standard range one offender fifteen years at the Tennessee Department of Correction[ ].

> In count number five, possession of a firearm the recommendation is three years at the Tennessee Department of Correction[ ], it is at one-

hundred (100%) percent and will be consecutive [to] count[s] one, two, three [the three convictions of first degree premeditated murder] and seven [unauthorized use of a motor vehicle].

In count number six of the indictment, Your Honor, the recommendation of both parties to employing a firearm during a dangerous felony is again a six year sentence at one-hundred (100%) percent. It is to be consecutive with counts one, two, three and seven, however concurrent with count five.

And the remaining count seven, unauthorized use of a motor vehicle, the lesser included offense, recommendation agreement between the parties is eleven months and twenty nine days. It will be concurrent with everything but counts five and six, the firearms.

The trial court accepted the sentences agreed upon by the parties.

The judgments, however, do not correctly reflect the concurrent or consecutive nature of the sentences announced by the State and approved by the trial court.[9] The judgment for the conviction of attempt to commit first degree murder in count four of the indictment provides that the fifteen-year sentence shall be served concurrently with counts one, two, three, and seven and consecutively to counts five and six. The "Special Conditions" portion of the judgment reflects that the fifteen-year sentence shall be served concurrently with counts one, two, three, and six and consecutively to count five. The judgment for the conviction of possession of a firearm with the intent to go armed during the commission of a dangerous felony in count five of the indictment provides that the three-year sentence shall be served concurrently with counts one, two, three, six, and seven and consecutively to count four. The judgment for the conviction of employing a firearm during the commission of a dangerous felony in count six provides that the six-year sentence shall be served concurrently with counts one, two, three, and seven and consecutively to count four. The judgment for the unauthorized use of a motor vehicle conviction in count seven provides that the eleven-month, twenty-nine-day sentence shall be served concurrently with counts one, two, three, four, and seven and consecutively to count five.

---

[9] In announcing that an agreement had been reached, trial counsel said, "We've got paperwork ready today." The "paperwork" was not described during the sentencing hearing. Following oral arguments in this case, this court entered an order requiring that the appellate record be supplemented with any orders relating to the sentencing of the non-capital convictions. The trial court clerk subsequently sent a notice to the clerk of this court that no such orders were located in the case jackets.

Because the trial court should have merged the possession of a firearm with the intent to go armed during the commission of a dangerous felony in count five with the employing a firearm during the commission or attempt to commit a dangerous felony convictions in count six, we remand for the entry of corrected judgments reflecting merger. The judgments also must be corrected to reflect accurately the sentences for the non-capital offenses agreed upon by the parties.

**[CONCLUSION]**