IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 19, 2022

**STATE OF TENNESSEE v. MALIQUE NICOLAS GRAY**

**Appeal from the Criminal Court for Bradley County**
**No. 2020-CR-214    Sandra Donaghy, Judge**

_____

**No. E2021-01134-CCA-R3-CD**
_____

The State filed a petition seeking to transfer seventeen-year-old Defendant-Appellant, Malique Nicolas Gray, for prosecution as an adult in criminal court. Prior to the transfer hearing, the Bradley County Juvenile Court Judge signed an order appointing the juvenile magistrate judge to hear the matter. The juvenile magistrate judge presided over the Defendant's transfer hearing and found probable cause to transfer the Defendant to the Bradley County Criminal Court to be tried as an adult. At the close of the transfer hearing, the juvenile magistrate judge advised defense counsel that she was sitting as a "substitute judge." Following a trial, the Defendant was convicted by a Bradley County Criminal Court jury of aggravated robbery, felony theft of property, misdemeanor theft of property, and burglary of an automobile. The Defendant received a concurrent term of eleven years for the aggravated robbery and three years for the felony theft of property, which was aligned consecutively to a concurrent term of two years for burglary of an automobile and eleven months and twenty-nine days for the misdemeanor theft of property, for an effective sentence of thirteen years' imprisonment. The Defendant's principal complaint on appeal is that the juvenile transfer hearing was "marred by procedural defects" because (1) the order by the juvenile court judge appointing the juvenile magistrate judge was "silent regarding any necessity or good cause [for the juvenile judge] to be absent;" and (2) the transfer hearing was conducted by a judge who did not identify herself as a "substitute judge" until the end of the hearing, depriving the Defendant of an opportunity to object and appeal to the elected juvenile court judge.[1] The Defendant also argues that the trial court

---

[1] We have revised the Defendant's issues for clarity. The precise issues as reflected in his brief are as follows:

1) If improper process is followed, and the trial court has a duty to follow that process, does a litigant, without receiving the notice required by statute and by the Supreme Court Rules, waive an issue? And if not, does the order of an improperly appointed substitute judge have legal effect in a criminal court?

2) Where a juvenile is tried and convicted as an adult, does his juvenile record apply just as if it were an adult criminal history, or should courts give full effect to the statutes and recognize that some important difference remains in their application to the separate categories.

erred in denying alternative sentencing under Tennessee Code Annotated Section 40-35-122, which prohibits continuous confinement for non-violent property offenses, and in imposing partial consecutive sentencing. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined, and JOHN EVERETT WILLIAMS, P.J., (not participating).[2]

Sheridan Charles, Cleveland, Tennessee, for the Appellant, Malique Nicolas Gray.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Stephen D. Crump, District Attorney General; and Coty Wamp, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On February 11, 2020, the Bradley County Juvenile Court Judge entered an appointment order for the Defendant's juvenile case. The extent of the order provided, "Pursuant to the combined powers of [Tennessee Code Annotated] Sections 37-1-107, 16-15-209, and 17-2-118, the Bradley County Juvenile Magistrate is appointed to hear this matter to its conclusion."

On May 5, 2020, a transfer hearing was conducted by the Bradley County Juvenile Court, with the Honorable Ashley Gaither, a juvenile court magistrate, presiding.[3] Danny Davis testified that he lived on Tomahawk Circle in Cleveland and that in January 2020, he reported to Cleveland police that his "Glock 19 Gen 4" firearm had been stolen from the console of his Chevrolet pickup truck. The truck had been parked in his driveway on January 7, 2020, and on "that particular morning for whatever reason [the door was] unlocked." Davis discovered that other "small items" were missing from the truck and that the contents of the truck interior "was in extreme disarray." He provided the serial number from the firearm to the Cleveland police, and he estimated its value as $500.

---

[2] The Honorable John Everett Williams passed away on September 2, 2022, and did not participate in this opinion. We acknowledge his faithful service to this Court.

[3] The record shows a factual discrepancy in the date of the transfer hearing and the name of the sitting judge. The title page of the transfer hearing lists the date of the hearing as May 5, 2020, and the sitting judge as "Ashley Gaither." However, the order of transfer shows the date as May 14, 2020, and it is signed by "Ashley Ivey." Neither party takes issue with these discrepancies; thus, we deem them immaterial to the disposition of the issues presented herein.

Davis testified that he had previously installed "four high-definition night vision cameras" around his home. One camera showed the "cul-de-sac, part of [the] neighbor's yard, [his] driveway, and specifically [his truck]." Davis reviewed the video footage from his surveillance cameras and discovered that "two young males" walked across his neighbor's yard, entered his [truck], and had taken his firearm and other belongings. Davis provided a DVD of the video surveillance to law enforcement. The DVD was approximately seven minutes in duration and showed the "perpetrators slightly before and slightly after" the offense. The video was played for the court and admitted as an exhibit at the hearing. Davis narrated the video, identified his pickup truck, and described "the suspect[s] about to illegally enter my [truck] and steal my firearm." Davis identified a "screen shot" photograph taken from the video showing the same, which was admitted into evidence at the hearing.

On cross-examination, Davis explained that the surveillance footage was recorded using infrared light and that the clothing worn by both males "reflect[ed] in the camera in the shade of black and white." He described one man as having on a pair of pants that had "two different contrasting shades of gray[.]"

William Young testified that on January 7, 2020, he lived on Peerless Road in Cleveland, and woke up around 4:00 a.m., which was "earlier than normal" to go to work. He remotely started his 2013 Nissan Altima, put on his shoes, and grabbed his coffee before walking to his car that was parked in his driveway. As he walked to the front of his car, he heard an "individual screaming at me get down, get down, get down." Another individual was close behind. Young put his hands up and turned to find a firearm pointed at his head. He began to back up and gave his wallet, keys, and telephone as the individual demanded. He described the two individuals as Black males. Young testified that the individual with the firearm then got into the driver's seat of his Nissan Altima and the remaining individual got into the passenger's seat. Young watched the car head "northbound" and take a left "towards the interstate."

Young explained that because he had remotely started his car, the driver of the car would need to insert the key to put the car in gear. The individual initially "killed the [car]" when he tried to put the car in reverse, but he was quickly able to restart the engine. Young stated that when he was accosted, he turned quickly and touched the firearm. He testified that he was familiar with firearms because he was "previous law enforcement and also a firearms instructor for Bradley County." He said the firearm was black, and he confirmed that it was "real."

Young stated that he kept a "Glock 22 Gen 4 .40 caliber" firearm in the center console of his Nissan Altima. He kept a "bailout bag," comprised of medical gear, a gunshot wound kit, extra ammunition, gloves, and handcuffs behind the driver's seat of the

- 3 -

car. He estimated the value of his car to be greater than $10,000 and explained that the car was never returned, but it was "totaled out by the insurance company." Young's car insurance company paid off the remaining balance of his car loan.

After reporting the incident to the Cleveland Police Department, Young spoke with detectives and identified the perpetrator from a photographic array. During the hearing, he also identified the Defendant as the same individual who held a gun to his head on the day of the offense.

On cross-examination, Young testified that he did not get down as the perpetrator had ordered and that neither individual became more aggressive or threatening when he failed to comply. He "remained on the premises" after handing over his wallet, keys, and telephone, but "created as much distance as [he] could from the [car]" by walking to the far side of his girlfriend's car that was also located in the driveway. Young asserted that his Nissan Altima had "90,000" miles and that he determined the value of the car to be $10,000 because he "owed over [that amount] on it, and it was worth as much as [he] owed."

Officer Robert Hirko testified that he had worked with the City of Collegedale Police Department ("CCPD") for seven years and that in January 2020 he was working as a patrolman. During the early morning hours of January 7, 2020, CCPD had received "numerous BOLOs [] for stolen [cars] coming out of Bradley County." Specifically, a white Nissan had been reported as stolen. At 4:24 a.m., Officer Hirko was parked at a bank near the "9236 block of Lee Highway" when he received a call from a fellow CCPD colleague, Officer Hennessee, stating that Officer Hennessee was following a white Nissan. Officer Hennessee had called dispatch to "run" the Nissan license plate to determine if it matched the BOLO from Bradley County.

As Officer Hirko pulled out of the bank parking lot to follow the Nissan, Officer Hennessee made a U-turn. Dispatch confirmed that the Nissan had been reported stolen, and Officer Hennessee and Hirko activated their blue lights immediately after making the turn. The driver of the Nissan did not stop, continued down Lee Highway, "attempted to go left at Hunter Road, and then did an almost immediate U-turn." The Nissan "went back onto Lee [Highway] and then took I-75 southbound at a high rate of speed." Officer Hirko soon overtook Officer Hennessee to become the lead car in the pursuit because his "[car] had a greater capacity[.]" He witnessed the Nissan "weaving in between traffic" and speeding at "135 miles an hour[.]" Officer Hirko slowed down because he "[did not] know what was going to happen," and he witnessed the Nissan "get off the interstate at Exit 7."

Officer Hirko did not see which way the Nissan turned but believed it had taken a left towards Old Lee Highway. He quickly observed the Nissan and followed "a good

- 4 -

distance back because of the wet roads[.]" He followed the Nissan for "eight miles" and observed the Nissan crash while on Little Debbie Parkway. He reported the crash and then saw "someone running out of the passenger seat." The same individual jumped from a nearby bridge. Officer Hirko described the individual as an "African-American male" with "an afro" and wearing a blue sweatshirt.

Officer Hirko approached the car to look for the driver, and he saw the individual running down "the embankment of the bridge." The embankment led to "a little creek" and abutted a wooded area. He chose to pursue the driver instead of the passenger because he "physically heard [the driver]." Officer Hirko "went around into the [nearby] Walmart parking lot[,] tried to set up a perimeter[,] and call[ed] out to the gentleman to stop running." He continued to hear the individual in the wooded area, and he "could see a black figure running[.]" Officer Hirko was unable to apprehend the perpetrator. The dashcam video from Officer Hirko's car pursuit was admitted into evidence as an exhibit.

During cross-examination, Officer Hirko admitted that he did not see what clothing the driver was wearing, but he described him as "wearing all black." He searched the Walmart parking lot "for approximately 15, 20 minutes" and recalled "about 15 to 20 officers in the general area."

Sergeant Corey Loftis testified that she was working at the CCPD as a patrol sergeant on January 7, 2020. She explained that CCPD had received "a suspicious party call at Walmart" providing a description of one of the subjects from the car pursuit. She testified that when CCPD "made contact with [the subject], he was sitting on the curb and he was soaking wet, which matched up with him entering the creek and the clothing description." Sergeant Loftis identified the Defendant as one of the subjects. She said that the car crash site was "[a]pproximately 200 yards" from where the Defendant was found sitting on the curb. The Defendant was arrested and held until he was transferred to the Cleveland Police Department.

Corporal Mark Hennessee testified that although he had recently received a promotion at the time of the transfer hearing, he was a patrolman on January 7, 2020, and he was dispatched to the scene of a crash that involved a car that had "previously been given out to us as a BOLO." He explained that "the two occupants of the [car] had fled the scene after the crash." He searched the car and found a "Glock handgun" that was loaded with ammunition in the passenger area. Additionally, he found "a couple of phones," "a go-bag," and a wallet. During cross-examination, Corporal Hennessee explained that he reported the serial number associated with the firearm found in the car, but it was "returned [as] not stolen at that time."

Detective Kody Fox testified that he had worked for the Cleveland Police Department for "almost 10 years" and that he was working in both the person and property crime unit in January 2020. On January 7, around "4, 4:30 [a.m.]," he received a call about an aggravated robbery that had occurred on Peerless Road. Upon arrival, he obtained some basic information surrounding a stolen car from a fellow officer and the victim, William Young. Young had given a description of the car, a description of the two perpetrators, and information about which direction the suspects had driven following the robbery. While there, Detective Fox received a phone call from the CCPD informing him that the victim's stolen car had been recovered in a crash. He drove back to the police station and learned that a suspect had been detained.

Detective Fox met the Defendant at the Collegedale Police Department, and after asking the Defendant's name and learning that he was seventeen years old, Detective Fox contacted the Defendant's guardian. Both the Defendant and his guardian agreed to speak with Detective Fox and Detective Steven Warner in a recorded interview. During the interview, the Defendant stated that he was in Chattanooga with three other males, "Dee, Tony, and Quan," and that the three individuals had "picked him up in a white Ford [F]usion[]," and "they [] went to Cleveland to smack." The Defendant explained to Detective Fox that "smack" meant to "take cars." From Defendant's statement, Detective Fox "pieced together" with Young's report that the Defendant and the other men had "made contact with [] Young out in the driveway of his house and that Dee had put the gun in[] Young's face. They both got in the car and then drove to Collegedale." The Defendant denied taking the gun from the car or pointing the gun at Young. Detective Fox identified a photograph of the Defendant at the time he was interviewed which was entered into evidence as an exhibit, and later confirmed by Young to be the person who held the gun to his head during the robbery. The Defendant was then transported to the Bradley County Juvenile Center. Detective Fox testified that "Dee" had not been apprehended, but "Tony" was arrested for auto burglaries and "Quan" had an active warrant for auto burglaries.

Following the interview, Detective Fox collected the evidence gathered from the stolen vehicle and checked the serial number located on the firearm. Although the firearm had not been reported stolen at that time, a "gun trace form" indicated that the firearm was registered to Danny Davis in Cleveland. Davis confirmed that the firearm was missing, and Detective Fox obtained the surveillance video from Davis's property. Detective Fox confirmed that "screen shot photograph" from Davis's surveillance video showing the male who entered Davis's pickup truck was the same as the photograph of the Defendant from the recorded interview. In both the surveillance video and the photographs from his interview, the Defendant wore pants with "a long stripe down the side" and shoes of the "same brand and the same make." Detective Fox also developed a photographic array based on the description by Young of the suspect. Two days after the offense, Young identified the Defendant's photograph from the photographic array as the individual who

held a gun to his head. The photograph identification form, instructions, and photographic array of six individuals was admitted into evidence as an exhibit. The photographic identification form was signed by Young, and reflected identification of photograph 4, the Defendant's image, as the perpetrator of the offense.

During cross-examination, Detective Fox agreed that the Defendant wore a dark sweatshirt, a knit hat, dark pants with a light-colored stripe down the side, and dark shoes during the interview. He did not agree that the photograph taken from the infrared cameras depicted the actual colors of the individuals' clothing. Detective Fox agreed that the Defendant's guardian was not present for the photo array, nor was the Defendant afforded counsel to observe the photo array.

Detective Steven Warner testified that on January 7, 2020, he was notified that an aggravated robbery had taken place in Cleveland. He accompanied Detective Fox to the Collegedale Police Department to interview the Defendant. Following the conclusion of the interview, Detective Warner recalled that Detective Fox had stepped into the Collegedale's property and evidence room, and Detective Warner sat with the Defendant in the hallway. Detective Warner could not remember the exact wording, but he heard the Defendant say, "when we got in the car I knew [Young] was a police officer. And I – I should have used the gun that was in [Young's] car to kill him." On cross-examination, Detective Warner asserted that Collegedale Lieutenant Michael Westfield was also present during the Defendant's statement about Young.

The Defendant's legal guardian, Shanteka Bennett, testified that she had previously been appointed by the Hamilton County Juvenile Court as his guardian. She was also the Defendant's maternal cousin and had known him his entire life. She asserted that at the time of the offenses, the Defendant was preparing for his GED, in the process of looking for employment, and had been submitting various applications. She could not recall having issues with the Defendant and could not recall a time that he had been in legal trouble prior to December 2019. On cross-examination, Bennett testified that the Defendant had been in trouble at school, but she did not know the details of his expulsion. She denied knowing about theft charges from December 2019, but she was aware that he had been "placed on probation." She also confirmed that the Defendant completed anger management as part of his probation. Ms. Entwhistle,[4] a detention officer at the facility where the Defendant was being held, testified that the Defendant had been in custody for three months and had not been written up or received any demerits.

At the conclusion of the evidence and argument of the parties, the court engaged in extensive oral findings supporting probable cause to transfer the Defendant to be tried as

---

[4] The record does not include the full name for this witness.

an adult in the Bradley County Criminal Court.  Upon defense counsel's inquiry following the probable cause determination, the juvenile magistrate judge advised that she was sitting as a substitute judge.

On May 20, 2020, an order was entered to transfer the Defendant to the Bradley County Criminal Court to be tried as an adult.  It is signed by "Ashley Ivey," as substitute judge.  On June 8, 2021, a trial was held based on substantially the same proof that was offered at the juvenile transfer hearing.  The Defendant was subsequently convicted of all counts as charged in the indictment.  For count one, the Defendant was convicted of aggravated robbery based on the intentional taking of Young's wallet, keys, cellphone with a deadly weapon; for count two, the Defendant was convicted of theft of property less than $10,000, for taking Young's car without consent; for count three, the Defendant was convicted of auto burglary based on entering Davis's car with the intent to commit theft; and for count four, the Defendant was convicted of theft under $1000 based on taking Davis's firearm from his car without effective consent.

Prior to sentencing, both parties submitted sentencing memorandums to the court.  On August 27, 2021, a sentencing hearing was held during which the presentence report was entered into evidence without objection.  The presentence report official version of events section explained, in relevant part, that prior to the instant offenses, the Defendant and three other individuals had gone to several hotels in the Cleveland area to "go[] through unlocked cars," when the police "got behind their [car]," and a high speed chase ensued resulting in a car crash.  All four individuals fled on foot and in their effort to get away, the Defendant and "D" committed the offenses at bar.  Based on the Tennessee Department of Correction's Strong-R Assessment, and the Defendant's statements and criminal history, the probation officer concluded the Defendant's "risk level [was] high for violence." The presentence report also showed the Defendant had been placed in segregation for assaulting a deputy and for fighting with another inmate.  The presentence report also showed that the Defendant did not finish high school and dropped out after the eleventh grade.  The Defendant self-reported his mental health as "fair" and a prior diagnosis of "ADHD," for which he had taken medication.  He had used marijuana at age twelve or thirteen, and he used Percocet or Xanax every two weeks since 2019.  The Defendant was unmarried with no children.

A certified copy of a Hamilton County Juvenile Court Judgment document entitled "Findings and Recommendations of the Magistrate" was also admitted into evidence without objection.  This document showed, in relevant part, that the Defendant had entered a guilty plea to "theft over $10,000 . . . and Fraudulent Use of a Credit Card," and had been placed on "probation for six (6) months" beginning on December 16, 2019.  The document further provided that the Defendant's mother, Candace Gray, was "unable to supervise [the Defendant] due to her work hours.  The parties [agreed] Shanitka Bennett, sister, [would]

- 8 -

supervise said child." The document required the Defendant to "cooperate with all steps designed to address all of the concerns, identified by ongoing assessments, which brought him into custody . . . includ[ing] physical and mental health, educational information and needs, and recommended treatments."

Detective Fox testified that he had been in law enforcement for ten years and that his general duties and responsibilities as a detective primarily consisted of investigations into "people related crimes, [and] violent crimes." He asserted that he was the lead detective in the Defendant's case and that he had prior experience with juveniles engaging in the crime of aggravated robbery. He was also aware of other detectives in his department who investigated juveniles that committed aggravated robberies. He testified that these occurrences had become more common and more frequent in Cleveland during his tenure on the police force and he recalled "upwards of 10 violent crimes involving juveniles with weapons [] over the course of the past couple of years." Detective Fox named several violent juvenile cases that he had been personally involved with and described the most recent event involving juveniles attempting to break into a Fuel Mart who were accosted by several other juveniles that resulted in robbery at gun point. He was aware of instances in which victims had been grievously injured by juveniles during the commission of aggravated robbery. Detective Fox described the large amount of resources needed for the investigation of a juvenile committing aggravated robbery, including initial officers, patrol officers, detectives, and crime scene technicians. He stated that the Defendant's particular case spanned "three different jurisdictions" and "over 20 officers" had responded. On cross-examination, Detective Fox asserted that he had not reviewed any statistics on juvenile crime, but that he was only speaking to his experience during his time in law enforcement.

Detective Warner testified that he was present during the Defendant's interview with Detective Fox, and that he was alone with the Defendant immediately after the interview. He restated that he believed the Defendant said he knew that Young was a police officer as soon as he saw the firearm and that he should "have killed [Young]."

The State concluded its proof, advised the court that it relied heavily upon its sentencing memorandum, and noted they were seeking a twelve-year sentence. The Defendant then provided an allocution, the written version of which was admitted as an exhibit, accepting responsibility for his actions and apologizing to the victims of his crimes. The State clarified its position and stated that it sought an effective fourteen-year sentence, twelve years to serve, and two years of supervised probation. The State recommended the court apply enhancement factors one, two, six, thirteen, and sixteen. In support, the State argued that the Defendant 1) had an extensive criminal history; 2) that he was a leader in an offense involving more than two actors; 3) that he caused damage to Young's car that was particularly great; 4) that the Defendant was released on probation at the time of the

commission of these offenses; and 5) that the Defendant had been adjudicated to have committed delinquent acts as a juvenile that would constitute a felony if committed by an adult to wit: theft over 10,000. The State argued further that the Defendant's potential for rehabilitation was "poor" based on his clear disregard for the law and failure of past efforts at rehabilitation. The State also relied on extensive charts attached to its sentencing memorandum reflecting an increasing trend in robberies in Bradley County. Defense counsel relied on his sentencing memorandum and argued that the Defendant was too young to have developed a record for purposes of having an extensive criminal history. Defense counsel noted the same exhibits relied upon by the State showed an overall decline in robberies statewide.

The court began its sentencing analysis with a review of the trial testimony. The court noted that there were "four people who came to steal cars, that there was police involvement and that car crashed, all of the persons ran, and it was [the Defendant] and this other person Dee that were . . . taken to trial." The court also considered the testimony of Detective Fox and Detective Warner from the sentencing hearing. The court accredited the information as outlined in the presentence report and specifically noted that the Defendant was a "youthful offender." Regarding the offenses against Davis, auto burglary and misdemeanor theft of the firearm, the court noted the firearm would be returned to Davis and there was no damage to his truck. Regarding the offenses against Young, aggravated robbery and felony theft, the court agreed with the State's analysis that property damage was particularly great because his car was "a total loss;" however, the court later declined to apply enhancement factor six on this ground.

From the presentence report, the court reviewed the Defendant's prior criminal behavior and noted that while the Defendant had been accused of vandalism, there was no proof to support that offense offered at the hearing. The court considered the certified findings from the Hamilton County Juvenile Court dispositional order which showed that the Defendant was on probation for six months for a prior felony theft and had been ordered to undergo certain assessments. The Defendant also had "convictions of use of a firearm during a felony, evading arrest, two counts; reckless driving, and no license." The court also highlighted the Defendant's lack of family support at the sentencing hearing, the fact that the Defendant had limited to no work experience and no assets or debts; the Strong-R assessment level of a high-risk and high needs, and the disciplinary writeups in the jail for assaulting an officer and fighting an inmate.

In considering the principles of sentencing, the court found the Defendant did not have a long history of criminal convictions in part because of his age. The court noted that the Defendant is beginning his adult "criminal justice career with a non-probatable Class B felony." Under section 40-35-103(b), whether confinement was necessary to avoid depreciating the seriousness of the offense and to serve as an effective deterrence to others,

the court noted the seriousness of the offense based on the "strong message" sent by the legislature that robbery with a deadly weapon is to be served at 85 percent. The court also accredited the testimony of Detective Fox that dangerous juvenile crimes were on the rise in Bradley County. For parity of sentencing for offenders statewide, the court additionally considered the statistical information, provided by the Tennessee Bureau of Investigation and Administrative Office of the Court, regarding the Defendant's convictions and determined that the mean sentence for aggravated robbery would fall between nine to ten years with a standard deviation of sixteen to twenty-two months, the mean sentence for felony theft was a thirty-three month sentence, and the mean sentence for auto burglary was roughly twenty-one to twenty-two months. The court specifically found "the law does not allow a sentence of split confinement for" the type of offenses the Defendant had committed. The court, relying in part on the charts provided by the State, found that statistics showed the number of aggravated robberies was on the rise in Bradley County, which supported a need for deterrence.

The court considered the nature of the crimes and noted that aggravated robbery was a violent crime against a person. The court determined the Defendant was a Range I, standard offender and applied enhancement factors one, two, thirteen, and sixteen. Based on the stolen and crashed car, evading arrest, and the Defendant's prior Hamilton County conviction of theft, the court determined the Defendant had a previous history of criminal behavior in addition to information necessary to establish his range. The court found that the commission of the offense involved two or more criminal actors, the Defendant and "Dee," and that the Defendant was "clearly a leader in the commission of the offense." Young identified the Defendant as the individual who held the gun to his head, and the Defendant was the driver of the stolen car belonging to Young that crashed. In support of enhancement factor thirteen, the court found the Defendant was on probation at the time of the offense. The court was "shock[ed]" that the Defendant "appeared in court, was given probation on [December 16, 2019], and then three weeks later comes here to Bradley County with these other people to break into cars[.]" Finally, based on the previously admitted exhibit from Hamilton County showing the Defendant adjudicated of a Class C felony theft, the trial court applied enhancement factor sixteen because the Defendant had been previously adjudicated to have committed a delinquent act that would have been considered a felony as an adult. The court found only one mitigating factor applied, factor six, because the evidence showed the Defendant lacked substantial judgment because of his youth.

In determining consecutive sentencing, the court found "even though [the Defendant] was only 19 years old by two days as of [sentencing]," the Defendant was a professional criminal who has knowingly devoted his life to criminal acts as a source of livelihood. The court also emphasized its previous determination based on the statistical information that confinement was necessary to avoid depreciating the seriousness of the

- 11 -

offense and to provide an effective deterrent.  The court found that measures less restrictive than confinement had recently been unsuccessfully applied to the Defendant and specifically noted that the "juvenile court system tried to help him and nonetheless, he's involved in a crime spree in Bradley County."  In concluding its extensive findings, the court explained:

> [I]t does not appear that [the Defendant] will abide by the terms of probation because when he was given a chance at probation, three weeks later he committed a new crime.  Society has a great interest in being protected from possible future criminal conduct of this [D]efendant.

The court sentenced the Defendant to a concurrent term of eleven years for the aggravated robbery and three years for the felony theft of property, which was aligned consecutively to a concurrent term of two years for burglary of an automobile and eleven months and twenty-nine days for the misdemeanor theft of property, for an effective sentence of thirteen years' imprisonment.  No motion for a new trial was filed.  This timely appeal followed.

## ANALYSIS

**I. Procedural Claims.**  The Defendant does not challenge the authority of the juvenile magistrate judge to sit as a substitute judge at his transfer hearing.  Rather, the Defendant contends that he is entitled to relief based upon procedural errors at his transfer hearing.  First, the Defendant argues that the transfer hearing is "void *ab initio*" because the juvenile court judge failed to comply with Tennessee Code Annotated Sections 16-15-209, 17-2-109, and 17-2-122, all statutes governing the procedure to appoint another judge when the elected judge is absent.  In accord with those statutes, the Defendant states that the juvenile court judge was required to establish "necessity" to support the appointment of a substitute judge, and no reason for the appointment was given in the appointment order.  Citing Tennessee Code Annotated Section 37-1-159(d), which provides no interlocutory appeal from the juvenile court transfer determination, the Defendant insists this direct appeal is the first opportunity to challenge the "misapplication of the law" in his juvenile court proceeding. In response, the State asserts this issue is waived because the Defendant failed to raise these claims at the transfer hearing.  See Tenn. R. App. 36(a); see In re Valentine, 79 S.W.3d 539, 545 (Tenn. 2002). Alternatively, the State contends that even if procedural errors were made, the Defendant is not entitled to relief because the juvenile magistrate judge was acting as a *de facto* judge under color of law pursuant to Tennessee Code Annotated Section 37-1-107.  See In re M.A.P., No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at *13 (Tenn. Ct. App. July 10, 2009).  We agree with the State.

The record shows that prior to the juvenile transfer hearing, the Bradley County Juvenile Court Judge entered an order for the Defendant's juvenile case based upon "the combined powers" of Tennessee Code Annotated Sections 37-1-107, 16-15-209, and 17-2-118, and appointed the juvenile magistrate judge to hear the Defendant's case. Section 37-1-107(a)(1) is specific to juvenile court magistrates and provides:

> The judge of the juvenile court may appoint one (1) or more suitable persons to act as magistrates at the pleasure of the judge. A magistrate shall be a member of the bar and may qualify and shall hold office at the pleasure of the judge. The compensation of a magistrate shall be fixed by the judge with the approval of the county legislative body or the pertinent governing body and paid from public funds.

Tennessee Code Annotated Section 16-15-209 provides, in relevant part:

> (a)(1) If the judge of a court of general sessions or juvenile court finds it necessary to be absent from holding court, the judge may seek a special judge in accordance with the requirements of and in the numerical sequence designated by this section.
>
> (2) If a special judge is necessary, the judge shall attempt to identify another judge who may serve by interchange, pursuant to § 17-2-208. If another judge cannot serve by interchange, a judge may seek to find any former or retired judge, who will, by mutual agreement, sit as special judge. The special judge shall serve by designation of the chief justice of the supreme court.
>
> (3) If the judge is unable to secure a judge under subdivision (a)(2), the judge may apply to the administrative office of the courts for assistance in finding a judge to sit by designation of the chief justice as a special judge.
>
> (4) Only after exhausting the procedures set out in subdivisions (a)(2) and (3), a judge may appoint a lawyer from a list, on a rotating basis, of lawyers that have been previously approved by the judge or judges of the district or county who are constitutionally qualified, in good standing, and possess sufficient experience and expertise. A lawyer appointed is subject to the following limitations, which shall be made known to persons attending any court proceeding presided over by a lawyer, as evidenced by an entry in the minutes or other permanent record of the court:

(A) The lawyer may preside only if the parties and counsel are notified that the duly elected or appointed judge will be absent and that a practicing lawyer will serve as a special judge;

(B) The parties choose to proceed and not to continue the case pending return of the duly elected or appointed judge;

(C)The lawyer shall not approve the payment of attorney's fees involving an indigent defense claim or any discretionary fees. A special judge shall approve fees only when the exact amount is set by statute; and

(D) At the opening of any court session presided over by a lawyer appointed pursuant to this section, an announcement shall be made to persons in attendance conveying the information contained in subdivisions (a)(4)(A) and (B). The making of such an announcement constitutes compliance with the notice requirements of this section.

Tenn. Code Ann. §16-15-209. Tennessee Code Annotated Section 17-2-109, generally, governs the ability of judges to address congestion or delay in litigation with the appointment of a retired judge or by designation of another judge by interchange.

Similarly, Tennessee Code Annotated Section 17-2-118 provides as follows:

(a) If, for good cause, including, but not limited to, by reason of illness, physical incapacitation, vacation or absence from the city or judicial district on a matter related to the judge's judicial office, the judge of a state or county trial court of record is unable to hold court, the judge shall appoint a substitute judge to hold court, preside and adjudicate.

(b) A substitute judge shall possess all of the qualifications of a judge of the court in which the substitute is appointed.

(c) No substitute judge may be appointed for a period of more than three (3) days; provided, that the judge appointed pursuant to this section may finish any trial that is commenced during the period of appointment.

(d) A substitute judge appointed pursuant to this section shall have no authority to award fees except those that are statutory.

(e) A substitute judge shall not preside over a cause without a consent form signed by all litigants who are present at the beginning of the proceeding. The consent form shall plainly state that the substitute judge has not been duly elected by the citizens of the judicial district or appointed by the governor but has been appointed pursuant to this section. Further, the consent form shall include the name of the lawyer appointed as substitute judge, the judge of the court in which the substitute judge is sitting, the date for which the substitute judge was appointed and the reason for the regular judge's absence. The consent form shall be transmitted and maintained on file for public inspection at the administrative office of the courts in Nashville.

(f)(1) Subsections (a)-(e) shall not apply where a judge finds it necessary to be absent from holding court and appoints as a substitute judge:

> (A) A duly elected or appointed judge of any inferior court; or
> (B) A full-time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer shall only serve as special judge in matters related to that officer's duties as a judicial officer.

Tenn. Code Ann. § 17-2-118(f)(1)(A)-(B), (f)(2).

In our view, the juvenile court judge invoked Section 37-1-107, the juvenile magistrate judge specific statutory provision, in appointing the juvenile magistrate judge to hear the Defendant's case. This statutory provision did not require the juvenile court judge to show good cause or necessity for being absent nor did it require any other additional steps for the appointment of the juvenile magistrate judge to preside over the Defendant's case. However, at the close of the proof at the transfer hearing, the following exchange occurred:

> DEFENSE COUNSEL: Your Honor, with regard to appeal, and, of course, that's something I'd have to discuss with my client ---
> ….
>
> DEFENSE COUNSEL: - - how is Your Honor sitting in this case and is there an appeal to ---

THE COURT: I'm sitting on this case as a substitute judge today. So if – it's like the civil side. You're going to appeal to Donaghy or Freiberg. As the civil side, you would appeal me to Sharp or Puckett.

DEFENSE COUNSEL: But as substitute judge there would not be, as I understand, an appeal to the elected juvenile judge?

THE COURT: No. That would be if I was sitting on this as magistrate.

DEFENSE COUNSEL: And I'm not saying we'll appeal, but –

THE COURT: I –

DEFENSE COUNSEL: -- I needed to know.

THE COURT: Yes. Yes. Exactly. And I do not care to explain that for you and all of that, but that's how I'm sitting on this case today. So please make sure if there's an order, that I sign.

For reasons unknown, the sitting juvenile magistrate judge said that she was sitting as a substitute judge *after* she had determined probable cause to transfer the Defendant to be tried as an adult. We are additionally constrained to observe that as the sitting juvenile magistrate judge, defense counsel had no credible basis in law to object on procedural grounds *prior* to the transfer hearing. We recognize the order of appointment by the juvenile court judge referenced the general statutes governing appointment of a special or substitute judge in the absence of the elected judge. However, we are troubled by the juvenile magistrate judge's curt instruction to defense counsel after the transfer hearing that she was serving as a substitute judge, rather than a juvenile magistrate judge. A sitting juvenile magistrate judge cannot change her status on a whim. We caution against this practice because, as evidenced by the facts of this case, it creates unnecessary procedural deficiencies and potential due process concerns. In any event, we acknowledge, as argued by the State, that the Defendant did not object on this ground at the transfer hearing.

In review of this issue, we must initially observe that any appeal from a juvenile court transfer hearing is governed by Tennessee Code Annotated Section 37-1-159. There is no civil or interlocutory appeal from a juvenile court's decision that a child should be dealt with as an adult in the criminal court. State v. Griffin, 914 S.W.2d 564, 566 (Tenn. Crim. App. 1995) (citing Tenn. Code Ann. §37-1-159(d)); State v. Mario A. Reed, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6-8 (Tenn. Crim. App. Aug. 31, 2010). We recognize that section 37-1-107 does not expressly exclude transfer determinations made by a juvenile magistrate from an appeal to an elected juvenile court

- 16 -

judge. However, if the juvenile court judge who presides over the transfer hearing is a lawyer, as in this case, the statute does not provide for an acceptance hearing in criminal court, and the criminal court has no authority to decline jurisdiction. Tenn. Code Ann. §37-1-159(d). Based on a plain reading of the statute, the ruling of a lawyer juvenile judge is not reviewable by the criminal court and the criminal court has no alternative but to accept jurisdiction over the juvenile. Griffin, 914 S.W.2d at 566 (describing process of obtaining appellate review of a lawyer juvenile judge's order transferring a juvenile to be tried as an adult as "awkward"). Accordingly, we agree with the Defendant, and conclude that this is his first opportunity to challenge the issues raised in this appeal.

Contrary to the Defendant's claim, however, the effect of the juvenile magistrate judge's change in her status to a substitute judge did not impact the Defendant's right to appeal to the elected juvenile court judge. While generally an order of a juvenile magistrate judge may be appealed to the elected juvenile court judge within ten days, see Tenn. Code Ann. §§37-1-107, -159, these provisions do not apply to a transfer hearing, see §37-1-159(d). As previously discussed, appeal of a transfer hearing may occur "if and only if a nonlawyer judge presides at the transfer hearing in juvenile court," which did not occur in this case.

In consideration of all the above circumstances, we are unwilling to waive review on the merits as argued by the State. We agree with the State's alternative argument and conclude that Tennessee Code Annotated Section 17-2-118 controls.

Tennessee Supreme Court Rule 11 serves as a companion to Section 17-2-118, outlined previously above, and sets out additional procedures that must be followed before appointing a special judge:

Where a judge of a trial court of record is ... unable to hold court, as provided in Tenn. Code Ann. § 17-2-118, the following procedure shall be followed, in the sequence designated, for the selection of a substitute judge.

(1) The judge shall seek interchange in accordance with Tenn. Code Ann. § 17-2-202;
(2) The judge shall apply to the presiding judge or, if the applying judge is the presiding judge, the presiding judge pro tempore of the judicial district to effect an interchange with a judge of that judicial district in accordance with Tenn. Code Ann. § 16-2-509(c);
(3) The presiding judge or the presiding judge pro tempore of the judicial district shall effect an interchange with a judge from another judicial district in accordance with Tenn. Code Ann. § 16-2-509(d);

- 17 -

(4) The presiding judge or the presiding judge pro tempore shall request from the director of the Administrative Office of the Courts the designation of a judge by the Chief Justice, in accordance with Tenn. Sup. Ct. R. 10B, § 1.04, Tenn. Code Ann. §§ 16-3-502(3)(A) and 17-2-110. The presiding judge or presiding judge pro tempore shall use the designation request form appended at the end of Tenn. Sup. Ct. R. 10B.

Tenn. Sup. Ct. R. 11, VII (c)(3).

The record does not show compliance with any of the above provisions prior to entry of the order by the juvenile court judge appointing a substitute judge in his absence. See Ferrell v. Cigna Prop. & Cas. Ins. Co., 33 S.W.3d 731, 739 (Tenn. 2000) (concluding that, only if the trial court has exhausted all of the statutory conditions, would it be appropriate to appoint another judicial officer to sit in his or her place). We also agree that the order of appointment was silent regarding necessity. Id. at 738 (emphasizing that the statute directs the absence be necessary and that a judge may not use mere convenience as a basis for being absent from court). However, the procedural errors in this case do not require reversal.

We first conclude that the "substitute" judge, who was in fact a sitting juvenile magistrate judge, served as a *de facto* judge acting under the color of law. Ferrell v. Cigna Prop. & Cas. Ins. Co., 33 S.W.3d at 739. We additionally rely upon the principles espoused in Sawyers v. State, 814 S.W.2d 725, 729 (Tenn. 1991), in which our supreme court concluded that the right to a transfer hearing "is sufficiently fundamental to be considered a matter of due process, in the context of juvenile justice." In Sawyers, the Defendant received no juvenile court transfer hearing because, at the time, no one, including Sawyers himself, knew his actual date of birth. Id. When Sawyers discovered eight years after his trial that he was actually a juvenile at the time of the offense, he filed the post-conviction petition. Id. In review of the issue, the supreme court noted, "[T]he absence of a transfer order cannot be said to affect the court's subject matter jurisdiction, which, in a real sense, is concurrent with that of the juvenile court as to certain offenses committed by children falling within a specified age span." The high court continued and noted that "[t]he only requirement ... is that such proceedings against a juvenile must originate in juvenile court." Id. The high court ultimately held that a juvenile transfer hearing constituted a fundamental procedural due process right and that because the petitioner had not been afforded a transfer hearing, his right to due process had been violated. To remedy the violation, the supreme court noted that "without the aid of a more fully-developed record, we cannot conclude that the due process error in this case was harmless, beyond a reasonable doubt." Id. at 729.

In applying the above principles to this case, we note that the Defendant does not challenge the authority of the juvenile magistrate judge, the probable cause determination, nor the subject matter jurisdiction of the criminal court. Additionally, the record is sufficient to show that the juvenile Defendant received a full and fair hearing in compliance with sections 37-1-134(a)(iv), (2)-(4), in juvenile court prior to being transferred to criminal court. Accordingly, because the due process violation stemming from not following the statutory procedure for appointment of a substitute judge cannot be said to have had a material impact on the outcome of the Defendant's case, we conclude that the Defendant is not entitled to relief.

**II.    Sentencing.**    The Defendant contends the trial court erred in imposing sentence. First, he relies upon State v. Astin D. Hill, in arguing that the trial court erred in imposing continuous confinement pursuant to Tennessee Code Section 40-35-122. No. W2012-02147-CCA-R3-CD, 2014 WL 683892, at *5 (Tenn. Crim. App. Feb. 19, 2014). The Defendant contends the trial court erred in relying on juvenile adjudications of delinquency in denying alternative sentencing and should have imposed an alternative to prison sentence for all nonviolent property offenses. Next, the Defendant asks this court to determine whether "juvenile supervision equates to probation under criminal statues for purposes of consecutive sentencing[.]" In response, the State relies upon State v. Andrew Young Kim, and argues that section 40-35-122 does not apply because the Defendant is a violent offender. No. W2017-00186-CCA-R3-CD, 2018 WL 1679346 (Tenn. Crim. App. Apr. 6, 2018) (no perm. app. filed). The State further contends that the trial court's order of partial consecutive sentencing is supported on multiple grounds including the Defendant's status as a professional criminal, the fact that the Defendant was on probation at the time the instant offenses were committed, and the Defendant's record of extensive criminal activity. We agree with the State.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see State v. King, 432 S.W.3d 316, 324 (Tenn. 2014) (applying the Bise standard to "all sentencing decisions"); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the Bise standard to alternative sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the

Defendant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively.  Tenn. Code Ann. § 40-35-115(a).  The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations."  State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013).  As relevant here, the trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood, the defendant is an offender whose record of criminal activity is extensive, or the defendant is sentenced for an offense committed while on probation. Tenn. Code Ann. § 40-35-115(b)(1), (2), (6).  In determining whether confinement is appropriate, the trial court should consider the following principles:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense  or confinement is  particularly  suited  to  provide  an  effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C) (2019). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)."  Pollard, 432 S.W.3d at 861. Additionally, the sentence imposed should be (1) "no greater than that deserved for the offense committed," and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), -103(4).

**A. Nonviolent Offenses.**  As an initial matter, the record shows the Defendant did not raise this issue before the trial court.  Relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."  See Tenn. R. App. P. 36(a). However, under the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Id.; see also State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) (applying plain error review to sentencing claims not raised before the trial court).  "Plain error"

- 20 -

review is also available when counsel fails to make a contemporaneous objection when an issue first arises. State v. Clayton, 535 S.W.3d 829, 847 (Tenn. 2017) (citing State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005)). "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." Id. (alteration in original) (citations and internal quotation marks omitted). In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

The defendant bears the burden of persuading an appellate court that the trial court committed plain error and that the error was sufficient magnitude that it likely changed the outcome of the trial. Clayton, 535 S.W.3d at 848. "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. Because the record shows the Defendant failed to request an alternative sentence based on section 40-35-122, this issue is waived. We therefore review only for plain error.

Here, the Defendant argues the trial court erred in failing to apply Tennessee Code Annotated section 40-35-122, which governs sentencing for nonviolent property offenses and provides, in relevant part, as follows:

(a) Notwithstanding any provision of law to the contrary, except as provided in subsection (b), the judge sentencing a defendant who commits a non-violent property offense, as defined in subsection (c), on or after July 1, 2010, shall not be authorized to impose the sentencing alternatives of continuous confinement in a local jail or the department of correction as authorized by § 40-35-104(c)(5), (c)(6), or (c)(8). However, the judge may sentence the defendant to any of the other sentencing alternatives authorized by § 40-35-104(c), which include, but are not limited to, periodic confinement, work release, community corrections, probation, or judicial diversion.
(b)(1) A defendant convicted of an offense set out in subsection (c) may be sentenced to any of the sentencing alternatives authorized by § 40-35-104(c),

including a period of continuous confinement, if the sentencing judge determines the defendant:

> (A) Has at least one (1) prior conviction at the time the subsection (c) offense is committed; or
> (B) Violated the terms and conditions of the alternative sentence originally imposed upon the defendant pursuant to subsection (a).

(2) As used in this subsection (b):

> (A)(i) "Prior conviction" means that the defendant serves and is released or discharged from, is serving, or is on escape status from a separate period of incarceration or supervision for the commission of a felony offense prior to or at the time of committing an offense on or after July 1, 2010, listed in subsection (c);
>
> > (ii) "Prior conviction" includes convictions under the laws of any other state, government or country that, if committed in this state, would constitute a felony. If an offense in a jurisdiction other than Tennessee is not identified as a felony in this state, it shall be considered a prior conviction if the elements of the offense are the same as the elements for a felony offense in this state; and
>
> (B) "Separate period of incarceration or supervision" includes a sentence to any of the sentencing alternatives set out in § 40-35-104(c)(3)-(9).

(c) As used in this section, a "non-violent property offense" is:
....
(11) Theft of property under § 39-14-103, where the amount of the theft is less than one thousand dollars ($1,000);
….
(18) Burglary of an auto under § 39-14-402(a)(4)[.]

Tenn. Code Ann. § 40-35-122(a), (b)(1)-(2), (c)(11), (c)(18).

In short, the above statute prohibits a trial judge from imposing continuous confinement for any of the enumerated offenses unless a defendant has a prior conviction

or has failed to comply with an alternative sentence imposed in accordance with the statute. This statute was enacted in 2010 with the goal of allowing non-violent property offenders "to work in order to pay restitution to the victims of their crimes without using scarce prison beds thereby permitting longer sentences for those offenders who do threaten public safety." State v. Astin D. Hill, No. W2012-02147-CCA-R3-CD, 2014 WL 683892, at *5 (Tenn. Crim. App. Feb. 19, 2014) (quoting Tenn. Code Ann. § 40-35-122, Compiler's Notes; 2010 Tenn. Pub. Acts ch. 1090, §1). Moreover, this court has previously held that section 40-35-122 is "clear and unambiguous; therefore, it should [be] enforced as written because 'it is generally presumed that the legislature acted purposefully in the subject included or excluded.'" Id. (quoting State v. Pope, 427 S.W.3d 363, 368 (Tenn. 2013)); see also State v. Hawk, 170 S.W.3d 547, 551 (Tenn. 2005) (discussing statutory interpretation).

With the enactment of section 40-35-122, the legislature decreed

"[D]eterrence and punishment of violent crime is a matter of compelling public interest that require[d] the highest priority when allocating scarce public resources for the purpose of imprisoning criminals. To ensure that sufficient prison space is available for certain violent offenders to serve a sentence of sufficient length to longer remove them as a threat to society and to deter others from committing these offenses . . .[.]"

Tenn. Code Ann. § 40-35-122, Compiler's Notes; 2010 Tenn. Pub. Acts ch. 1090, §1.

Simultaneously with the enactment of section 40-35-122, the legislature amended section 40-35-501(k)(1) to provide:

"[N]o release eligibility for a person committing aggravated robbery, as defined in § 39-13-402(a)(1), on or after July 1, 2010, and before July 1, 2022, until the person has served eighty-five percent (85%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236, or any other provision of law, shall operate to reduce below seventy percent (70%) the percentage of sentence imposed by the court such person must serve before becoming release eligible.

Id.

The parties agree that this court has thus far interpreted section 40-35-122 to apply to cases involving incarceration for nonviolent convictions alone, and not cases involving a mix of violent and nonviolent convictions, as we have here. The State insists that section 40-35-122 does not apply because the Defendant was convicted of a violent felony offense

- 23 -

to wit: aggravated robbery.  In arguing against application of section 40-35-122, the State asserts that the Defendant's interpretation of statute would yield an absurd result because "if [the Defendant] had shot and killed Young while holding the gun inches from his head during the robbery, and was sentenced to life for felony murder, he would still be required to be sentenced to probation or work release for the remaining nonviolent convictions." The State also points out that section 40-35-122 is inapplicable to defendants with a prior conviction; and, while the Defendant had a prior juvenile adjudication, the State urges this court to consider it as a prior conviction for purposes of section 40-35-122(b)(1)(A) because we have routinely permitted the use of juvenile adjudications in support of consecutive sentencing determinations based on extensive criminal history.  See Tenn. Code Ann. §40-35-122(b)(1)(A); State v. Dickson, 413 S.W.3d 735, 748 n.12 (Tenn. 2013).

We need not determine whether a juvenile adjudication is equivalent to a prior conviction for purposes of this statute because we conclude that section 40-35-122 does not apply to cases involving a mix of violent and nonviolent offenses.  The record shows the trial court placed particular emphasis on the clear message sent by the legislature in categorizing aggravated robbery as a violent felony offense for which the Defendant was required to serve a minimum of 85% prior to release eligibility.  The court further noted that it was a "non probatable" offense.  The stated purpose of section 40-35-122 is to ensure that sufficient prison space is available for violent offenders like the Defendant.  As such, the statute cannot logically be interpreted to provide violent offenders with the same alternatives to confinement in sentencing as non-violent offenders.  Accordingly, we conclude that the Defendant is unable to show that a clear and unequivocal rule of law has been breached, and he is not entitled to plain error relief.

**B. Partial Consecutive Sentence.**  The Defendant argues, and we agree, that there was insufficient evidence supporting imposition of consecutive sentencing based on a finding that the Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood.  However, the trial court also found that the Defendant was sentenced for an offense committed while on probation, 40-35-115(6), which was a sufficient basis to support consecutive sentencing.  Here, the Defendant seemingly concedes that consecutive sentencing was supported based on this ground. Nevertheless, he "asks this court to consider whether juvenile supervision equates to probation under the criminal statutes for purposes of consecutive sentencing" because "juvenile supervision differs materially from probation on criminal convictions."  The Defendant acknowledges, as argued by the State in response to this issue, that this court has repeatedly approved consideration of a defendant's history of juvenile adjudications in determining whether a defendant has an extensive record of criminal activity for consecutive sentencing purposes.  See State v. McDougle, No. W2007-02344-CCA-R3-CD, 2010 WL 455004, at *8 (Tenn. Crim. App. Feb. 10, 2010) (collection of cases).

Tennessee Code Annotated section 40-35-115(b)(6) specifically provides for consecutive sentencing where the trial court finds "the defendant is sentenced for an offense committed while on probation." The statute does not place any restriction or limitation on the word "probation," and we decline to read one into it. Accordingly, the trial court properly imposed partial consecutive sentencing in this case, and the Defendant is not entitled to relief.

## CONCLUSION

Based upon the above reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE